**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**


- - - - - - - - - - - - - - - - - - - - - - - - - - - **X**

In Re: A. Scott Bolden            **:**     **Case No. 1:23-mc-00040-LKG**

- - - - - - - - - - - - - - - - - - - - - - - - - - - **X**


**ANSWER OF A. SCOTT BOLDEN**
**TO SHOW CAUSE ORDER DATED JANUARY 17, 2023**

Arnold M. Weiner, Bar No. 01605
aweiner@rwllaw.com
Stuart A. Cherry, Bar No. 28012
scherry@rwllaw.com
Geoffrey W. Washington, Bar No. 25098
gwashington@rwllaw.com
Devon L. Harman, Bar No. 21936
dharman@rwllaw.com
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
Phone: (410) 769-8080
Fax: (410) 769-8811

*Attorneys for A. Scott Bolden*

# TABLE OF CONTENTS

**Page**

I.    THE JANUARY 17, 2023 SHOW CAUSE ORDER ........................................................1

II.   PERSONAL STATEMENT OF MR. BOLDEN ....................................................................2

III.  OVERVIEW ................................................................................................................3

IV.  PROCEDURAL HISTORY ..........................................................................................9

     A.     The Case Was Hard Fought ..............................................................10

     B.     The Exchanges Between Opposing Counsel Became Increasingly Heated And Personal .........................................................................11

     C.     Mr. Bolden's Emotions Were Pushed Beyond The Boiling Point ........................13

     D.     Mr. Bolden Promptly And Sincerely Apologized To The Court, And The Court Accepted The Apology .........................................................13

     E.     The Government Used The Juror Questionnaire Answers To Support Its Motion For A Gag Order ..................................................................14

     F.     The Defense Team, In Their Opposition, Used The Same Questionnaire Answers To Support Their Contrary Argument And Quoted Four Answers From Anonymous Jurors As Illustrative Of Their Point .............................................................................................15

     G.     The Court Immediately Ordered The Response Stricken .....................................16

     H.     The Court Entered Its First Show Cause Order, Directing All Defense Counsel To Show Cause Why They Should Not Be Held In Contempt For Violating Local Rule 204 When They Filed Their October 29th Opposition .........................................................................17

     I.     Defense Counsel Answered The First Show Cause Order In Writing .....................................................................................................18

     J.     The Court Held A Hearing On January 17th, Where It Heard Pending Motions And, After Calling On Mr. Bolden To Comment, Found That Mr. Bolden Had Violated Local Rule 204 .........................................19

i

K. The Court Announced That It Was Entering A Gag Order In Response To Mr. Bolden's September 14th Outburst And That Violation Of The Order Would Be Punishable By Contempt ...............................20

L. The Court Called On Mr. Bolden To Address The Conduct That Was The Subject Of The First Show Cause Order And The Conduct That Would Soon Be Added To A Second Show Cause Order............................21

M. The Court Announced That It Was Finding That Mr. Bolden Had Violated Local Rule 204 And That He Now Faced Punishment For His Criminal Contempt ...........................................................................23

N. The Court Took A "Personal Moment" To Express How "Hurtful" It Was To Hear About Mr. Bolden's Profanity.......................................24

O. The Court Expressed The Conclusion That Mr. Bolden Violated Local Rule 204 And That He Could Now Be Punished Summarily For Conduct Constituting Criminal Contempt.........................................24

P. The Court Immediately Issued Two Opinions That Mr. Bolden Violated Local Rules 204 And 201........................................................25

Q. The Court Issued Its Second Show Cause Order.................................26

R. Mr. Bolden Withdrew From His Representation Of The Defendant....................27

V. WHERE, AS HERE, THE COURT HAS NOT ISSUED ANY CASE-SPECIFIC ORDER OR DIRECTIVE TO COMPLY WITH A LOCAL RULE, THE MERE VIOLATION OF A LOCAL RULE IS NOT PUNISHABLE BY CRIMINAL CONTEMPT................................................27

A. The Statute Codified In 18 U.S.C. §§ 401 And 402 Confers The Authority For Prosecutions For Criminal Contempt ...............................28

B. The Commentators Agree That A Local Rule Is Not A "Rule," As That Term Is Used In §§ 401 And 402 And That, As A General Proposition, The Statute Does Not Permit Prosecutions For Criminal Contempt For Violation Of Local Rules..................................29

C. The Majority Of The Courts Of Appeal That Have Analyzed The Issue Have Agreed That A Local Rule Is Not A "Rule" Within The Meaning Of §§ 401 And 402 .................................................................29

D. The Situation Is Different Where, Unlike The Present Case, The Court Specifically Directs A Lawyer To Comply With A Local Rule And The Lawyer Disobeys The Directive ............................................33

E. In A Recent Case Concerning Whether The Attorney General Should Be Prosecuted For Violating The D.C. Local Rule That Is The Equivalent Of Local Rule 204, The Justice Department Argued, And The Court Agreed, That, In Light Of The *Brown* And *Kimsey* Cases, The Court Should Exercise Its Discretion Not To Prosecute For Alleged Violation Of A Local Rule ..................................................34

F. The Supreme Court Has Instructed The Federal Courts To Interpret § 401 Narrowly And In Accord With The Congressional Purpose To Limit Prosecutions For Criminal Contempt..........................................37

G. This Court Should Interpret Local Rules 204 And 201 Narrowly So That They Are Consistent With The Requirements Of The Governing Statutes And In Accord With The Principles Of Interpretation Dictated By The Supreme Court ....................................38

VI. THERE WAS NOTHING IMPROPER ABOUT THE DEFENSE TEAM'S BRIEF REFERENCE TO ANSWERS TO QUESTIONNAIRES GIVEN BY FOUR ANONYMOUS MEMBERS OF A FORMER JURY POOL. THE GOVERNMENT HAD MADE THE QUESTIONNAIRE ANSWERS AN ISSUE WITHIN THE CASE BY USING THE ANSWERS AS A BASIS FOR SEEKING A GAG ORDER, AND THE DEFENSE TEAM WAS ENTITLED TO REFER TO THE ANSWERS AS PART OF ITS OPPOSITION ..............................................................................................39

A. The Use Of Disqualifying Answers To Jury Questionnaires Is Not Regulated In This District By Local Rule, The Jury Selection Plan, Standing Order, Or Any Order Entered In The Underlying Case.........................40

B. The Defense Team Referred To The Four Questionnaire Answers As Part Of A Legitimate Argument In Opposition To A Government Motion That Put The Substance Of The Questionnaire Answers At Issue Within The Case ........................................................................41

C. The Fourth Circuit Has Declared That The Use Of Juror Questionnaires Is Governed By 28 U.S.C. § 1867(f), And That, Under The Statute, Questionnaire Answers May Be Disclosed When A Question Concerning The Same Has Properly Arisen In The Case ....................................................................................................42

D. Past Practice In This District Has Not Been So Protective Of Questionnaire Answers As The Show Cause Order In This Case Presumes ....................................................................................................43

iii

E.      Alternatively, Mr. Bolden Cannot and Should Not Be Punished For The References To The Jury Questionnaires In The Opposition Because There Were Fair Grounds For The Defense Team To Believe That It Was Proper To Make Such References In Opposition To The Government's Motion .............................................................47

VII.    MR. BOLDEN'S SINGLE USE OF A PROFANITY, UTTERED OUTSIDE THE COURTHOUSE AFTER THE CONCLUSION OF THE DAY'S PROCEEDINGS, AND NOT DIRECTED AT THE COURT OR ITS PERSONNEL, CANNOT AND SHOULD NOT BE PUNISHED AS A CRIMINAL CONTEMPT .........................................................48

VIII.   MR. BOLDEN CANNOT AND SHOULD NOT BE PUNISHED FOR CRIMINAL CONTEMPT BECAUSE THE COURT HAS ALREADY VINDICATED ITS AUTHORITY AND ENSURED THE FAIR ADMINISTRATION OF JUSTICE BY ACTIONS TAKEN IN THE UNDERLYING CASE .......................................................52

        A.      The Criminal Contempt Power Must Be Exercised Sparingly And In Accord With The Principle That The Court May Exercise Only The Least Possible Power Adequate To Accomplish Its Ends ............................53

        B.      The Less Onerous Remedies Administered In the Course Of The *Mosby* Case Have Already Vindicated The Court's Authority And Provided For The Due Administration Of Justice ................................55

IX.     IF MR. BOLDEN WERE SUBJECT TO CRIMINAL CONTEMPT, THE COURT WOULD NOT BE PERMITTED TO PROCEED WITH SUMMARY DISPOSITION UNDER SUBSECTION (b) OF RULE 42, FED. R. CRIM. P., BUT WOULD BE REQUIRED TO BEGIN ANEW WITH PROCEEDINGS THAT COMPLIED WITH SUBSECTION (a) OF THAT RULE ...................................................................59

        A.      The Text of 18 U.S.C. § 401 And Federal Rule Of Criminal Procedure 42(b) Do Not Support Summary Contempt for What the Court "Heard Of" .......................................................................60

        B.      Case Law Interpreting Summary Contempt Makes Clear That, To Qualify For Punishment By Summary Contempt, The Conduct Must Have Been In Front Of The Court, Or At Worst, In The Hallway Directly Outside The Courtroom .......................................................61

                1.      There Can Be No Summary Contempt For What Happened On The Courthouse Steps .........................................................61

iv

2.      There Can be no Summary Contempt for the Content of
        Court Filings ...............................................................................64

C.      The Criminal Contempt Proceedings That Have Taken Place Over
        The Past Four Months Have Not Complied With Either Rule 42(a)
        Or Mr. Bolden's Constitutional Rights................................................65

X.      IF CONTEMPT PROCEEDINGS WERE ALLOWED TO CONTINUE
        AGAINST MR. BOLDEN, THEY MUST BE BEFORE ANOTHER
        JUDGE.................................................................................................70

A.      Because The Court Has Made Factual Findings And Legal
        Conclusions That Mr. Bolden Committed The Violations For Which
        Mr. Bolden Faces Punishment For Contempt, And Because Those
        Findings And Conclusions Must Be Set Aside Because They Were
        Not Made In Proceedings That Comported With Rule 42(a) Or Mr.
        Bolden's Constitutional Rights, Any Further Proceedings Against
        Mr. Bolden Must Be Before A Different District Judge........................70

B.      Any Further Proceedings Should Proceed Before A Different
        District Judge Because The Court Has Taken Personal Affront At
        Mr. Bolden's September 14, 2022 Expletive.......................................71

XI.     CONCLUSION....................................................................................72

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Dunn*
6 Wheat. 204 (1821) ................................................................ 54

*Bessette v. W.B. Conkey Co.*
94 U.S. 324 (1904) ................................................................. 53

*Bloom v. State of Ill.*
391 U.S. 194 (1968) ............................................................... 54

*Brandt v. Gooding*
636 F.3d 124 (4th Cir. 2011) ............................................. 32, 65

*California Artificial Stone Paving Co. v. Molitar*
113 U.S. 609 (1885) ............................................................... 47

*Cammer v. United States*
350 U.S. 399 (1956) ............................................................... 37

*Clark v. Martinez*
543 U.S. 371 (2005) ............................................................... 38

*Cooke v. United States*
267 U.S. 517 (1925) ........................................................ passim

*Cromer v. Kraft Foods North America, Inc.*
390 F.3d 812 (4th Cir. 2004) ........................................... passim

*Eaton v. City of Tulsa*
415 U.S. 697 (1974) ........................................................ passim

*Ex parte Robinson*
19 Wall. 505 (1874) ............................................................... 53

*Fidrych v. Marriott International, Inc.*
952 F.3d 124 (4th Cir. 2020) ............................................... 47

*Finch v. United States*
433 U.S. 676 (1977) ............................................................... 69

*Gompers v. Buck's Stove & Range Co.*
221 U.S. 418 (1911) .......................................................... 32, 54

*Harris v. United States*
382 U.S. 162 (1965) ........................................................... 6, 62

*Harris v. Young*
607 F.2d 1081 (4th Cir. 1979) .......................................................... 69

*In re Baltimore Sun Co.*
841 F.2d 74 (4th Cir. 1988) ........................................................ passim

*In re Brown*
454 F.2d 999 (D.C. Cir. 1971) .................................................... passim

*In re McConnell*
370 U.S. 230 (1962) .................................................................. 30, 54

*In re Michael*
326 U.S. 224 (1945) .................................................................. 37, 54

*In re Minnis*
56 S.Ct. 503 (1936) .................................................... 5, 32, 55, 56

*In re Morrissey*
168 F.3d 134 (4th Cir. 1999) ........................................................ 4, 33

*In re Oliphant*
2022 WL 34144, No. 20-6163 (4th Cir. Jan. 4, 2022) .................... 5, 49, 52

*In re Sealed Case*
627 F.3d 1235 (D.C. Cir. 2010) .................................................. 51, 52

*In re Stewart*
571 F.2d 958 (5th Cir. 1978) ............................................................ 63

*Int'l UnionUnited Mine Workers of America v. Bagwell*
512 U.S. 821 (1994) ............................................................ 6, 54, 55, 68

*Jones v. Central Bank*
161 F.3d 311 (5th Cir. 1998) ............................................................ 36

*Kelley v. United States*
199 F.2d 265 (4th Cir. 1952) ............................................................ 64

*Nye v. United States*
313 U.S. 33, 51 (1941) ...................................................................... 37

*Offutt v. United States*
348 U.S. 11 (1954) .................................................................... 54, 72

*Proctor v. Vishay Intertechnology, Inc.*
584 F.3d 1208 (9th Cir. 2009) ................................................. 31

*Richmond Black Police Officers Ass'n v. City of Richmond, Va.,*
548 F.2d 123 (4th Cir. 1977) ................................................. 7, 41, 66

*S.D. Warren Co. v. Maine Bd. of Envt'l Prot.*
547 U.S. 370 (2006) ................................................................ 32

*Sacher v. United States*
343 U.S. 1 (1952) ..................................................................... 54

*Seymour v. United States*
373 F.2d 629 (5th Cir. 1967) ................................................... 36

*Shillitani v. United States*
384 U.S. 364 (1966) ................................................................ 54

*Spallone v. United States*,
493 U.S. 265 (1990) ................................................................ 54

*Taggert v. Lorenzen*
139 S.Ct. 1795 (2019) ............................................................. 47

*Unique Apparel, Inc. v. Monies*
1989 WL 50207, 875 F.2d 316 (Table) (4th Cir. 1989) ......... 6, 54, 57

*United States v. Byers*
603 F.Supp.2d 826 (D.Md. 2009) ...................................... 4, 43, 45, 48

*United States v. Concord Management & Consulting LLC*
No. 18-cv-32-2, 2019 WL 7758635 (D.D.C. July 1, 2019). ... 3, 34, 35, 36

*United States v. Cutler*
58 F.3d 825 (2d Cir. 1995) ..................................................... 4, 33

*United States v. Dixon*
509 U.S. 688 (1993) ................................................................ 69

*United States v. Herrera*
252 F.3d 1355, WL 422627 (5th Cir. 2001) .......................... 36

*United States v. Kimsey*
668 F.3d 691 (9th Cir. 2012) ............................................... passim

viii

*United States v. Koubriti*
305 F.Supp. 2d 723 (E.D. Mich. 2003)............................................................ 6, 57, 58

*United States v. Marshall*
371 F.3d 42 (2nd Cir. 2004)................................................................ 50, 51, 52

*United States v. McMahon*
104 F.3d 638 (4th Cir. 1997) .......................................................................... 40

*United States v. Minarik*
842 F.2d 333, 1988 WL 24217 (8th Cir. 1988) ............................................. 36

*United States v. Mottweiler*
82 F.3d 769 (7th Cir. 1996) ...................................................................... 3, 58

*United States v. Murphy*
326 F.3d 501 (4th Cir. 2003) ......................................................................... 28

*United States v. Neal*
101 F.3d 993, 997 (4th Cir. 1996) ................................................... 7, 57, 68, 70

*United States v. Peoples*
698 F.3d 185 (4th Cir. 2012) ................................................................... passim

*United States v. Thompson/Center Arms Co.*
504 U.S. 505 (1992)........................................................................................ 38

*United States v. Trudell*
563 F.2d 889 (8th Cir. 1977) .................................................................... 33, 63

*United States v. United Mine Workers of America*
330 U.S. 258 (1947)........................................................................................ 53

*United States v. West*
21 F.3d 607 (5th Cir. 1994) ........................................................................... 41

*United States v. Wilson*
421 U.S. 309 (1975)....................................................................... 54, 62, 63, 65

*United States. v. Robinson*
922 F.2d 1531 (11th Cir. 1991) ...................................................................... 41

*Young v. United States ex rel. Vuitton et Fils S.A.*
481 U.S. 787 (1987).................................................................................. passim

**Statutes**

18 U.S.C. § 401 ................................................................................................ passim

18 U.S.C. § 402 ............................................................................... 28, 29, 31, 32

28 U.S.C. § 1867 .......................................................................................................... 4

**Rules**

Fed.R.Crim. P. 42 ........................................................................................... passim

Local Rule 201 ................................................................................................ passim

Local Rule 204 ................................................................................................ passim

**Other Authorities**

Jury Selection Plan for the United States District Court for the District of Maryland ................. 41

Levenson, *Federal Criminal Rules Handbook* (2020 ed) ........................................................ 29

Williams, 15A Cyc. of Federal Proc. § 87:3 (3d ed. and Jan. 2023 Update) ............................... 29

Wright & Miller, 3A Fed.Prac. & Proc. Crim. § 704 (4th ed and April 2022 Update) ............ 4, 29

A. Scott Bolden, Respondent, by his undersigned attorneys, submits this Answer to the Show Cause Order entered herein on January 17, 2023.

## I.     THE JANUARY 17, 2023 SHOW CAUSE ORDER

On January 17, 2023, this Court entered an Order initiating the instant proceedings.  The Order recites that "the Court finds that Defense Counsel Bolden **VIOLATED** Local Rule 204 by: (1) Disclosing confidential responses to the Court's juror questionnaire in the Defendant's September 29, 2022 filing; (2) Making certain extra-judicial statements during a press conference held on September 14, 2022; and (3) Using profanity during the September 14, 2022, press conference."  The Order further recites that, "The Court also finds that Defense Counsel Bolden **VIOLATED** Local Rule 201 by submitting the September 29, 2022, Filing without the signature of Maryland Defense Counsel." *In re Bolden,* ECF 2.

The Order also declares that Local Rule 204.6 "provides that any violation of this Rule may be treated as a contempt of court and may subject the violator to disciplinary action of the Court."  It also states that, "The Court concludes that any finding of contempt based upon Defense Counsel Bolden's violations of Local Rule 204 would involve the imposition of criminal contempt under *Cromer.*"[1] *Id.*

The Order commands that "Defense Counsel Bolden shall **SHOW CAUSE,** in writing, … as to why the Court should not:

(1)     Impose criminal contempt sanctions;

(2)     Make a criminal referral to the United States Attorney's Office for this District pursuant to Fed.R.Crim. P. 42; and/or

(3)     Revoke Defense Counsel Bolden's *pro hac vice* admission in *United States v. Marilyn J. Mosby,* 22-cr-0007.

---

[1] The reference was apparently to *Cromer v. Kraft Foods North America, Inc.,* 390 F.3d 812 (4th Cir. 2004).

1

*Id.* (emphasis in original).[2]

## II.     PERSONAL STATEMENT OF MR. BOLDEN

Apart from the succeeding portions of this Response prepared by counsel, Mr. Bolden

believes that it is essential for him to take this occasion to make the following personal statement:

> I apologize deeply and sincerely for my emotional outburst outside the courthouse and for the failure of the defense team to realize that the Court expected the filing containing references to the answers to four juror questionnaires to be made under seal. I have only the greatest respect for this Court and the entire judicial system, and I am profoundly distressed by the thought that I would ever willfully or contumaciously engage in conduct that would be an affront to this or any other court.

> I grew up in a house in which my father was a highly regarded lawyer and, in the last fifteen years of his career, a greatly respected trial judge. I was taught by my father to respect the law and its institutions, and throughout my own career, I have assiduously conducted myself in a manner that brought credit to my heritage and to myself. I was rewarded for my exemplary conduct, and for my ability to be both a role model and a mentor, by being made the managing partner of the Washington, D.C. office of a prestigious international law firm.[3]

> I now find myself responding to a show cause order for criminal contempt based on my conduct as former defense counsel in a criminal case in this Court. While the exigencies and stresses of a high profile case, such as the prosecution of Marilyn Mosby, cannot justify inappropriate conduct on the part of those who perform roles in the prosecution and defense of such a case, it is also true that the circumstances of that particular prosecution evoked

---

[2] Item (3) of this Order was mooted, and there was no *pro hac vice* admission to be revoked, when Mr. Bolden withdrew from the case. *See* ECF 188. The January 17, 2023 Order was the second Show Cause Order entered against Mr. Bolden. On September 30, 2022, the Court issued a Show Cause Order ("First Show Cause Order") to Mr. Bolden and all other defense counsel in *United States v. Marilyn J. Mosby,* Case No. 22-cr-0007, directing them to show cause "as to why the Court should not impose the penalty set forth in Local Rule 204.6" based upon the same September 29, 2022 filing that is the subject of the January 17, 2023 Order ("Second Show Cause Order"). *See* Ex. "9." The Court also entered the same Second Show Cause Order in the *Mosby* case (ECF 173) that the Court entered to initiate the present case.

[3] *See* Ex. "1," my biography as it appears on my firm's website.

themes that struck some of my core beliefs and may very well have colored my perceptions and caused me to react emotionally and inappropriately to what I perceived as an unfair attack upon me and my client for the purpose of obtaining a delay of the *Mosby* trial.

I have already received widespread criticism for the contentiousness that accompanied my defense of Ms. Mosby and for the antagonisms that were engendered by that defense. That criticism will not only have a profound effect upon my career going forward, but it will also cause other lawyers to exercise restraint in their own conduct under similar circumstances. I ask that the adverse effects that I am now experiencing, and will continue to suffer, not be compounded by "the dark stain" of criminal contempt.[4]

## III.   **OVERVIEW**

There are compelling and dispositive legal and policy reasons why this Court should accept Mr. Bolden's heartfelt apology and not proceed further:

*First,* a lawyer cannot be prosecuted for criminal contempt for violation of a local rule except when the court has previously issued a specific directive to comply with the local rule and the lawyer fails to adhere to that directive. *United States v. Kimsey,* 668 F.3d 691, 699-702 (9th Cir. 2012); *In re Brown,* 454 F.2d 999, 1002-1006 (D.C. Cir. 1971); *United States v. Concord Management & Consulting LLC,* No. 18-cv-32-2, 2019 WL 7758635 (D.D.C. July 1, 2019). Here, Mr. Bolden engaged in the conduct that is allegedly violative of Local Rule 204 of this District before the Court issued its January 17, 2023 Order requiring compliance with Local Rule 204, and he did not thereafter engage in any such conduct. Under these circumstances, Mr. Bolden cannot be prosecuted for violation

---

[4] *United States v. Mottweiler,* 82 F.3d 769, 770 (7th Cir. 1996) ("Criminal contempt of court is a dark stain on an attorney's record, even when it does not lead to imprisonment or substantial fine." (Easterbrook, J.).

of Local Rule 204. *See also* Wright & Miller, 3A Fed.Prac. & Proc. Crim. § 704, n. 7 (4th ed and April 2022 Update). *Cf. In re Morrissey,* 168 F.3d 134 (4th Cir. 1999); *United States v. Cutler,* 58 F.3d 825 (2d Cir. 1995).

**Second,** the defense team's brief reference to answers to questionnaires given by four anonymous members of a former jury pool, as part of its publicly filed Opposition to the Government's Motion for a gag order, was not improper. The Government made the answers to the questionnaires an issue within the case by relying upon them to support its publicly filed Motion for a gag order, and the defense team referred to the four answers as part of their contrary argument in their publicly filed Opposition. The Fourth Circuit recognizes that juror questionnaire answers are regulated by 28 U.S.C. § 1867(f) and that the statute authorizes disclosure when "some question concerning the same should properly arise within the case." *In re Baltimore Sun Co.,* 841 F.2d 74, 75 (4th Cir. 1988). In another highly publicized case in this District, *United States v. Byers,* 603 F.Supp.2d 826 (D.Md. 2009), Judge Bennett, on the eve of trial, employed a procedure whereby the Court and the defense lawyers publicly filed hundreds of disqualifying answers to juror questionnaires, identifying the prospective jurors by number and quoting from their answers. In *Byers,* as here, disqualifying answers to juror questionnaires were publicly filed as part of a legitimate process, preliminary to trial, to assure that the Defendant obtained a fair trial.

**Third,** Mr. Bolden's single use of a profanity, uttered in an emotional moment outside the courthouse after the day's proceedings, and not directed at the Court or its personnel, cannot and should not be punished as a criminal contempt.

Mr. Bolden apologized to the Court on and off the record, as soon as he could, and the Court accepted the apology. *See Eaton v. City of Tulsa,* 415 U.S. 697 (1974) (recognizing that "a single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support [a] conviction of criminal contempt"); *In re Oliphant,* 2022 WL 34144, No. 20-6163 (4th Cir. Jan. 4, 2022) (criminal contempt conviction reversed where spectator used profanity in a single emotional outburst while exiting the courtroom). *Cf. United States v. Peoples,* 698 F.3d 185 (4th Cir. 2012) (criminal contempt conviction affirmed where party was engaged in a campaign of disruption and, as part of that campaign, in the courtroom, interrupted a courtroom clerk engaged in her duties and gave her a profane message to relay to the judge).

*Fourth,* Mr. Bolden cannot and should not be punished for criminal contempt because the Court has already vindicated its authority and ensured the fair administration of justice by its actions in the underlying case. In considering whether to exercise its criminal contempt power, the Court is obligated to use "only the least possible power adequate to the end proposed." *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987). The Court vindicated its authority and ensured the end that it sought by: (1) striking the October 29, 2022 Opposition and requiring that it be filed under seal; (2) obtaining and accepting Mr. Bolden's prompt apology for his emotional outburst outside the courthouse; and (3) entering a gag order broader than the gag order sought by the Government and warning that any violation of it will be punishable by criminal contempt. *See e.g., In re Minnis,* 56 S.Ct. 503 (1936) (finding that punishment of a lawyer for criminal

contempt for having filed an offensive and accusatory brief was not appropriate when the Court struck the offensive brief and the lawyer apologized to the Court); *Int'l Union, United Mine Workers of America v. Bagwell,* 512 U.S. 821, 831 (1994); *Unique Apparel, Inc. v. Monies,* 1989 WL 50207, 875 F.2d 316 (Table) (4th Cir. 1989) (reversing conviction of a party for criminal contempt for defiance of a District Judge's order to appear at a hearing because the District Judge was able to resolve the matter in the party's absence); *United States v. Koubriti,* 305 F.Supp.2d 723 (E.D. Mich. 2003) (apology for repeated extrajudicial statements was adequate).

**Fifth,** if Mr. Bolden were subject to criminal contempt for his alleged violations of Local Rule 204, the Court would be required to proceed in compliance with the procedures required by Rule 42(a) for indirect contempt. Statements outside the courthouse, not personally witnessed by the Court, do not constitute direct contempt because they are not misbehavior "in the presence [of the court] or so near thereto as to obstruct the administration of justice" within the meaning of 18 U.S.C. § 401(1). They are not subject to summary disposition under Rule 42(b) because they are not contumacious conduct that "the judge saw or heard." *See Harris v. United States,* 382 U.S. 162 (1965) (refusal of witness to testify before grand jury not summarily punishable, even though witness was required to repeat the refusal in open court); *Peoples,* 698 F.3d at 192 (interior of courthouse is outer limit of geographic area for purposes of summary punishment). Filings in a case, and even a letter written to a judge, are not direct contempts that can be punished

summarily. *Cooke v. United States,* 267 U.S. 517, 534-35 (1925); *Kelley v. United States,* 199 F.2d 265 (4th Cir. 1952); *Cromer,* 390 F.3d 812.

**Sixth,** if Mr. Bolden were subject to further proceedings for criminal contempt, the proceedings would have to take place before a different District Judge. The Court pursued criminal contempt proceedings against Mr. Bolden for three and a half months without following the procedures required by Rule 42(a) and without providing for Mr. Bolden's constitutional rights. The Court has already gone so far as to determine that Mr. Bolden committed violations for which he may now be punished. Those determinations must be set aside, and, if there were to be future proceedings, they would have to begin anew and before another judge. *See Richmond Black Police Officers Ass'n v. City of Richmond, Va.,* 548 F.2d 123, 126 (4th Cir. 1977); *United States v. Neal,* 101 F.3d 993, 997 (4th Cir. 1996). Furthermore, although Mr. Bolden's comments outside the courthouse were not directed at the Court and were not intended to be disrespectful toward the Court, the Court took those remarks as disrespect toward her and candidly revealed her "personal" reaction to what she perceives as conduct "hurtful" to her and others. Rule 42(a)(3) provides that, under circumstances such as these, any further proceedings in the case should take place before another District Judge.

**Seventh,** under all the circumstances, and even if Mr. Bolden were subject to prosecution and punishment for criminal contempt for his comments outside the courthouse and the defense team's filing of the Opposition, the Court should exercise its discretion to close this case. Mr. Bolden is an outstanding lawyer who has practiced honorably for more than three decades. His utterance of an expletive

in the extreme heat and stress of a difficult representation was completely uncharacteristic. It was an action that had never occurred before and has not occurred since. Mr. Bolden has been a devoted leader of his community throughout his life and he has spent countless hours and significant treasure for causes that benefit those who need assistance to make meaningful and successful lives for themselves. Sparing Mr. Bolden the shame of referral and/or conviction for criminal contempt would be an act of judicial grace that would take into account the vast difference between the conduct that offended the Court and the many admirable acts that Mr. Bolden performs daily. To demonstrate the chasm between the single lapse of judgment that caused Mr. Bolden to lash out momentarily and all the other aspects of Mr. Bolden's life that bring credit upon him and his community, we have attached Declarations from a few of the people who know Mr. Bolden, who know how out of character his outburst was, and who know how remorseful Mr. Bolden is for that regrettable outburst. *See* Declaration of Hon. Gerald Bruce Lee, United States District Judge for the Northern District of Virginia (retired), Ex. "24;" Declaration of Hon. Kurt L. Schmoke, President of University of Baltimore and former Mayor of Baltimore City, Ex. "25;" Declaration of Benjamin F. Wilson, Esq., Former International Chair, Beveridge & Diamond (retired), Ex. "26;" Declaration of Artis Hampshire-Cowan, Esq., founder of Leveraged Leadership Group and Senior Fellow, Association of Governing Boards of Universities and Colleges, Ex. "27;" and Declaration of Ronald Sullivan, Jr., Esq., Clinical Professor of Law, Harvard Law School and Faculty Director of the Harvard Criminal Justice Institute, Ex. "28." Consistent with the aims of the

contempt statutes, and with the great caution that a Court exercises in determining whether to punish for criminal contempt, we respectfully request that the Court give every consideration to Mr. Bolden and exercise its discretion in favor of dismissing these proceedings.

## IV.  **PROCEDURAL HISTORY**

On January 13, 2022, a Grand Jury for the District of Maryland indicted Marilyn J. Mosby, who was then the State's Attorney for Baltimore City.  The Indictment charged her for violations of the federal criminal code, 18 U.S.C. §§ 1014 and 1621 and 28 U.S.C. §1746., relating to statements she made on an application for withdrawal of funds from her Baltimore City retirement account during the recent COVID-19 crisis and relating to statements she made on an application that she submitted for a purchase money mortgage.  The case was opened as *United States v. Marilyn J. Mosby,* Case No. 22-cv-00007-LKG and assigned to the Hon. Lydia Kay Griggsby, United States District Judge. ECF 1.[5]

On January 24, 2022, the Court granted the motions of A. Scott Bolden, Esq. ("Mr. Bolden") and three other lawyers from his firm to appear *pro hac vice* as defense counsel for Ms. Mosby. ECF 10.[6]  A member of the bar of the District Court previously entered his appearance as defense counsel.  ECF 5.  Other members of the bar of the District Court entered their appearances as additional defense counsel.[7]

---

[5] Unless otherwise indicated, the ECF references in this memorandum are to filings in *United States v. Marilyn J. Mosby,* Case No. 22-cv-00007-LKG.
[6] The others were: Rizwan A. Qureshi, Esq., Kelly C. Miller, Esq., and Anthony R. Todd, Esq.
[7] As of June 1, 2022, defense counsel who were members of the bar of the District Court were Gary Edward Proctor, Esq. and Lucius T. Outlaw, Esq. ECF 63, 64, 65.

## A.    The Case Was Hard Fought

The case was hard fought by both the prosecution and the defense and, as sometimes occurs in high profile cases, Mr. Bolden's subjective beliefs about the fairness of the prosecution impacted the zeal with which he fought for his client.  The Government obtained a Superseding Indictment on March 10, 2022, adding counts relating to statements Ms. Mosby made on a second mortgage application.  ECF 23.  Both before and after the Superseding Indictment, Ms. Mosby, through Mr. Bolden and other defense counsel, filed various motions, including motions to dismiss, for particulars, to disqualify opposing counsel, to exclude evidence, to prevent Government experts from testifying, to strike surplusage, to continue the trial and to change venue. ECF 16, 17, 18, 38, 70, 80, 82, 83, 84, 85, 151, 156, 159.  The Government filed responses to the motions that likewise demonstrated strong emotions, and, in addition, filed motions to exclude defense evidence, to forbid defense argument, to exclude defense experts and to exclude supplemental opinions of a defense expert.  ECF 78, 79, 111, 163.  From the very beginning, the Court kept remarkable control of the often-heated exchanges through frequent telephone conferences, status conferences and motion hearings.  ECF 13, 20, 31, 35, 40, 51, 59, 62, 67, 104, 108, 115, 121, 133, 170.

On May 23, 2022, the Court entered an Order scheduling trial for September 19, 2022. ECF 61.  Five weeks later, on July 1, 2022, the Government disclosed that an FBI agent was expected to testify at trial as a summary witness about Ms. Mosby's financial transactions and that an IRS agent would testify about certain IRS forms.  At the same time, the defense disclosed three experts, one of whom was Jerome Schmitt, and furnished information about the experts' proposed testimony.  On July 15, 2022, the Government filed a Motion for Adequate Disclosure and To Exclude, challenging all three of the defense experts.  ECF 79, Ex. "2." The Government confirmed its understanding that the defense disclosed that Mr. Schmitt would testify about "the effect of the

COVID-19 pandemic on Ms. Mosby's financial condition beginning in the Spring of 2020 …," and "as to the impact that the COVID-19 pandemic has had on Ms. Mosby's finances … at the times that Ms. Mosby requested withdrawals from her 457(b) plan." The Government complained, however, that these disclosures were inadequate. *Id.* at 15-17. Both sides also filed other motions *in limine.*

### B. The Exchanges Between Opposing Counsel Became Increasingly Heated And Personal

By the time that the expert disclosure issues came to a hearing on September 7, 2022, these issues became a flash point and the exchanges among counsel became increasingly heated and personal. By way of example only, one of the prosecutors accused defense counsel of making an argument about one of the Government's proposed witnesses that was "not true" and about which "they know it's not true." ECF 108, Ex. "3" at Tr. 33:4. Another prosecutor asserted that defense counsel was "play[ing] a game" and that the contentions of defense counsel were "particularly misleading." The first prosecutor also accused defense counsel of deliberately withholding Mr. Schmitt's opinions, stating that the defense "have the opinions" but are "just sitting on them." *Id.* at Tr. 128:19-23. Defense counsel, who were not immune to that same virus, accused the prosecutors of trying to put on expert testimony "through the back door." *Id.* at Tr. 47:8-10.

At the conclusion of the September 7th hearing, the Court directed defense counsel to supplement the disclosures of the defense witnesses by September 9th and, with particular reference to Mr. Schmitt, "to more clearly state what his opinion or opinions will be at the trial and the basis for those opinions." *Id.* at Tr. 125:16-21. The defense served the supplemental designation on September 9th and, in the last two paragraphs, stated that Mr. Schmitt would offer expert testimony: "as to the financial and economic effects of Covid-19;" "on the value of Ms. Mosby's investments in publicly-traded companies," including "the reasons why" the Dow Jones average lost 37%; on

"how the economic effects of COVID-19 caused a decline in Ms. Mosby's [retirement account] of more than 17%;" on "the losses suffered by many travel businesses;" and on "the ability of an early-stage travel-related company, like [Mahogany Elite] to generate revenue in 2020 after the COVID-19 pandemic began."

The heated personal attacks upon defense counsel and, particularly, the accusation that defense counsel were acting in bad faith with respect to expert witnesses, only intensified in the subsequent proceedings. On September 13, 2022, the day before a scheduled status conference, the Government filed a Motion To Exclude Opinions, asking that the opinions in Schmitt's supplemental disclosure be excluded or that the Court continue the trial. ECF 111-2, Ex. "4." Resuming their charge of bad faith, the prosecutors stated that the defense "undoubtedly had her experts' opinions for months" but "**chose** to email the Government additional disclosures at 11:17 p.m. on Friday," and that defense counsel were **"deliberately late"** in filing their disclosures. *Id.* at 3, 20.

The temperature increased further at the hearing the next day, September 14th. One of the lead prosecutors asserted that the conduct of defense counsel was **"outrageous"** and that defense counsel, in the September 9th supplemental filing (to comply with the Court's September 7th directive) **"ambushed us."** ECF 134, Ex. "5" at Tr. 62:15-21. The same prosecutor went on to assail defense counsel for **"try[ing] to hide the ball"** and making a **"ridiculous"** argument. *Id.* at Tr. 80:7, 81:13-14. The Court ruled that it would continue the trial to permit the Government to engage an economist or travel industry expert to counter Mr. Schmitt. *Id.* Tr. 82:7-83:12. Mr. Bolden asked for a new schedule for the Government's expert designation and for trial. *Id.* at Tr. 85:4-89:11. The Court set a hearing for the next day, September 15th, for that purpose.

## C. Mr. Bolden's Emotions Were Pushed Beyond The Boiling Point

Mr. Bolden had spent the preceding weeks immersed in preparation for a trial that was to begin on September 19th, and the personal attacks that the prosecutors levelled against the defense team in arguing for the delay pushed the temperature beyond the boiling point. When Mr. Bolden exited the courthouse and was confronted by the reporters who customarily gathered there, he lost control of his emotions. In a moment of unbridled exasperation, that he never before nor ever since experienced, he referred to the prosecutors' tactics as "bull----." He also voiced his exasperation at Ms. Mosby being prosecuted for a withdrawal from her retirement account and repeated a version of a statement that he had made in Court, namely that similarly situated government employees who had made COVID withdrawals from their government retirement plans were also at risk of prosecution.

## D. Mr. Bolden Promptly And Sincerely Apologized To The Court, And The Court Accepted The Apology

As soon as he regained control, Mr. Bolden was filled with contrition for letting his emotions get the better of him. He recognized that he owed the Court a genuine apology. The next day, unprompted by the Court and before the Court convened, Mr. Bolden was invited to meet with the Court and, in chambers, expressed his profound regret for his out-of-court outburst. He also asked for, and was granted, the opportunity to humble himself in open Court and repeat for the record, and for the world to hear, his abject apology. *See* ECF 135, Ex. "6" at Tr. 70:21-71:10.

The Court began the proceedings on September 15th with a discussion of scheduling, including the creation of a timeline for "what needs to be done to get ready for trial." *Id*. Tr. 3:20-4:11. After an extended discussion and further argument from counsel about experts, the Court determined that jury selection for the rescheduled trial would begin on March 24, 2023 and that

the trial itself would begin three days later. *Id.* at Tr. 64:18-23. The Court then took note that "[t]here was a motion filed earlier today by the Government," and gave the defense until September 29, 2022 to respond to it. *Id.* at Tr. 69:4-70:16.

The Court then addressed Mr. Bolden and asked, "[I]s there anything else you wish to say to the Court?" *Id.* at Tr. 70:19. Mr. Bolden then declared:

> Yes, Your Honor. To the Court, to the institution, federal and state courts, to judges, it's been reported that in a public statement I issued profanity or used profanity about the Order or the Government's decision to seek a continuance. That was inappropriate. I own it. **I apologize to the Court, the institution, the judges that make up this great body, both federal and state.** As you know, my father who passed away was a former city state judge. I've been a member of the bar-- three bars over 35 years and been around the law for 50 years as a young man watching my father try cases. I know better. **I was very frustrated, and I apologize again. It will never happen again. And I'm disappointed in my choice of words for sure.** If my mother was with us, she'd be hitting me upside the head as she should. So I apologize, Your Honor. Thank you.

*Id.* at Tr. 70:21-71:10 (emphasis added).

The Court responded by stating:

> Thank you very much Mr. Bolden. The Court certainly **accepts and appreciates your apology.**

*Id.* at Tr. 71:11-12 (emphasis added). The Court then thanked all for their work in setting up the new schedule and adjourned the hearing. *Id.* at Tr. 71:13-19.

### E. The Government Used The Juror Questionnaire Answers To Support Its Motion For A Gag Order

The Government Motion that the Court referenced at the September 15th hearing was the Government's Motion For An Order Pursuant to Local Rules 204 & 603. ECF 120, Ex. "7." The Motion sought an order, commonly known as a "gag order," prohibiting counsel, the parties and witnesses from making statements "when they are entering, exiting or within the vicinity of the

courthouse." *Id.* at 1. The Motion made specific reference to the comments that Mr. Bolden made the previous day, for which he was about to apologize and promise never to repeat. *Id.* at 1-2.

The Government's Motion also described juror questionnaire answers given by potential jurors from the jury pool that was assembled for the September 19th trial date, who were no longer potential jurors because the trial was postponed for six months. Using the questionnaire answers as a reason for the gag order, the Government wrote that:

> And **the data the Court recently collected** from potential jurors **via a questionnaire** establishes that **jurors are paying attention** to media coverage of the case and will, therefore, be exposed to Mr. Bolden's extrajudicial statements. **The questionnaires** provided by this Court **indicate that a large portion of the jury pool is familiar with this case** from the media, and **substantial portion of the individuals indicated they had already made up their mind** about the case based on press coverage.

*Id.* at 2 (emphasis added). **"[J]udging from the responses** [to the questionnaires] **received by the Court,"** the Government concluded, the Court should prohibit "courthouse press conferences and inflammatory statements with a narrowly tailored order prejudiced here." *Id.* at 7 (emphasis added).

### F. The Defense Team, In Their Opposition, Used The Same Questionnaire Answers To Support Their Contrary Argument And Quoted Four Answers From Anonymous Jurors As Illustrative Of Their Point

On September 29, 2022, the defense filed Defendant Marilyn J. Mosby's Opposition to the Government's Motion for An Order Pursuant to Local Rules 204 and 603. ECF 123 [STRICKEN], Ex. "8" (submitted with this Answer under seal). On the seventh and eighth pages of the Opposition were two paragraphs that addressed the significance of the answers to the questionnaires that had been provided by the members of the jury pool that was assembled for the previously scheduled trial. These paragraphs were written in direct response to the Government's

statements about the significance of the answers to the questionnaires given by the former prospective jurors, and most of the discussion in both paragraphs was expressed in the same conclusory terms that the Government used in its Motion. The defense argued in the Opposition that the publicity to date had been hostile to Ms. Mosby and that the questionnaire answers showed that a great number of the prospective jurors had made up their minds that Ms. Mosby was guilty. *Id.* at 7-8 (under seal).

Seven lines of the Opposition referred to responses from four members of the previous jury pool, known only by their juror numbers, and quoted briefly from the opinions of those four unnamed prospective jurors regarding Ms. Mosby's guilt. The text of the Opposition showed that these references were made to emphasize a legitimate argument in response to an issue that the Government properly made part of its Motion.[8]

## G. The Court Immediately Ordered The Response Stricken

The next day, September 30, 2022, after the Court saw the Opposition, the Court entered an Order reciting that, "Defendant included certain confidential responses of prospective jurors to the Court's juror questionnaire for this matter and juror numbers in this filing." ECF 124, Ex. "9." (the "September 30, 2022 Show Cause Order"). The Court referred to Local Rule 204.1, prohibiting "[a]n attorney" from "directly or indirectly releas[ing] … any information or opinion concerning any imminent or pending criminal litigation if there is a reasonable likelihood" that the release "will interfere with a fair trial or otherwise prejudice the due administration of justice." *Id.* at ¶2. The Court also declared that Local Rule 204.4 instructs that counsel "shall not give or authorize any extra-judicial statement or interview, relating to the trial or the parties or issues in

---

[8] Counsel would have requested leave to file the Opposition under seal if they had believed it might not be permissible to make these brief references in their public filing.

the trial, for dissemination by any means of public communication." The Court further declared that, "Local Rule 204.6 provides that any violation of the rule **'may be treated as a contempt of court** and may subject the violator to the disciplinary action of the Court.'" *Id.* (emphasis added).

"In light of the foregoing," the Court went on, the Court "DIRECTS the Clerk of the Court to STRIKE the Defendant's Response" and "DIRECTS Defendant to RE-File her response in opposition, consistent with Local Rule 204, on or before October 3, 2022." *Id.* at 1-2.

> **H.** **The Court Entered Its First Show Cause Order, Directing All Defense Counsel To Show Cause Why They Should Not Be Held In Contempt For Violating Local Rule 204 When They Filed Their October 29th Opposition**

The Court also directed "counsel for Defendant" to show cause why they should not be punished for contempt of court or otherwise disciplined, stating that the Court:

> DIRECTS counsel for Defendant to SHOW CAUSE as to why the Court should not impose the penalty set forth in Local Rule 204.6 based on the subject filing, on or before **October 7, 2022.**

*Id.* at ¶4 (emphasis in original).

On October 3, 2022, the defense filed a Revised Opposition to the Government's Motion for a gag order. The Revised Opposition informed the Court that, "Out of an abundance of caution given the Court's September 30, 2022 Order to Show Cause, State's Attorney Mosby has removed all references to juror questionnaires from this filing… ." ECF 125, Ex. "10" at n. 4. The revised version was the same as the original Opposition in almost all other respects. Most importantly, and in the original Opposition, it took note of the fact that the Government's Motion for a gag order was based largely on Mr. Bolden's unfortunate September 14th lapse. In that respect, it further stated, Mr. Bolden had never before "used a four-letter word in such situations," and he

"has already apologized" to the Court and "has assured the Court that it will not happen again …."
*Id.* at 4, n. 4.

## I.  Defense Counsel Answered The First Show Cause Order In Writing

On October 7, 2022, the three defense counsel listed on the stricken September 29th filing (Messrs. Bolden, Qureshi and Todd) responded to the Court's September 30, 2022 Show Cause Order requiring them to file a written response as to why the Court should not impose the penalty, including contempt, set forth in Local Rule 204.6.  ECF 126, Ex. "11."  The lawyers made a number of factual statements and legal arguments in their defense.  Among other things, they stated that they had acted in good faith; that Local Rule 204 did not contain an explicit command not to refer to jury questionnaires; and that they "could not have anticipated that the use of quotations from the juror questionnaires would run afoul of Local Rule 204.1" *Id.* at 2.  They also stated that they had no intention of doing anything improper, and did not do anything wrong, because: "the defense was **responding** to the information and conclusions stated in the Government's motion, without including any personal information about the potential jurors" and that "the defense [only] endeavored" to "respond effectively to the arguments made by the [G]overnment." *Id.* at 2-3.  The lawyers also contended that, under the circumstances, their limited references to the questionnaire answers did not create "a reasonable likelihood" of "interfer[ence] with a fair trial or otherwise prejudice the due administration of justice." *Id.* at 3, 5.  They pointed out that, when they filed the September 29th Opposition,  the trial had already been postponed for six months, and the pool of jurors who answered the questionnaires would not be in the jury pool from whom the trial jury would later be selected. *Id.* at 5.

On October 20, 2022, the defense filed a sealed Motion to Transfer Venue, asking that trial be held in the Southern Division.  ECF 128, 129.  The sealed Motion made references to the

answers given to the questionnaires sent to the previous prospective jury pool. The defense contended that these answers militated in favor of a change of venue.[9]

Four days later, on October 24, 2022, the Court entered an Order scheduling a hearing for December 15, 2022, on (1) the Government's September 15th Motion for a gag order, (2) the Court's September 30, 2022 Show Cause Order, and (3) the Defendant's October 20, 2022 Motion to Transfer Venue. ECF 133. A week later, on November 2, 2022, the Court's Chambers Administrator emailed Mr. Bolden that, "The Court would like all defense counsel reflected on the attached list to be present at the December 15 hearing … ." Ex. "12." The list contained the names of all seven lawyers who had entered their appearances for the defense. Mr. Bolden asked if the Court wanted a lawyer from his firm's Chicago office and another who had just briefly appeared at the beginning of the case. *Id*. The Court Administrator replied that, "… for now, all must appear." *Id*. Minutes later she added that "this will best allow all counsel an opportunity to be heard" and that "[t]he Court is sensitive to the fact that this may require travel for some attorneys." *Id*. The Court later excused the lawyer from Chicago and the lawyer who had only entered his appearance to move Mr. Bolden's admission.

**J.** **The Court Held A Hearing On January 17th, Where It Heard Pending Motions And, After Calling On Mr. Bolden To Comment, Found That Mr. Bolden Had Violated Local Rule 204**

The hearing was rescheduled from December 15th to January 17, 2023. At the outset of the hearing, the Court stated that it would take up the Government's Motion for a gag order first and the Defendant's Motion for a transfer of venue second. "Lastly," the Court remarked, "the Court

---

[9] In its Response to the Motion to Transfer Venue, the Government made reference to the questionnaire answers in a public filing and that those same answers provided the basis for denying transfer of venue. ECF 142 at 4, 10-11.

has allowed defense counsel 20 minutes to address the Court's Show Cause Order, and you will have an opportunity to do that at that time." ECF 186, Ex. "13" at Tr. 6:22-23. The Court added that, "The subject of the Court's Show Cause Order, of course, is the release of confidential juror questionnaires, not the actual substance of those responses." *Id.* at Tr. 7:25-8:3. The Court further emphasized that, "the issue there is a disclosure of confidential responses and whether that is inconsistent with the Court's local rules, not the content of those responses." *Id.* at Tr. 8:7-9.

### K. The Court Announced That It Was Entering A Gag Order In Response To Mr. Bolden's September 14th Outburst And That Violation Of The Order Would Be Punishable By Contempt

In asking for the entry of a gag order pursuant to Local Rule 204, the prosecutors stated that Local Rule 204 is "a pretty standard thing" and that "D.C. has the same thing." *Id.* at Tr. 14:1-4. After argument from both sides, the Court declared that it would enter a gag order to prohibit extra-judicial comments by counsel in accordance with the limitations of Rule 204. "And while the Court's local rules already do so," the Court emphasized, "a court order, I think, will reinforce that and of course be subject to contempt sanctions if it is violated." *Id.* at Tr. 36:3-5. The Court made it clear that the Order was being entered in response to Mr. Bolden's September 14th outburst where "[t]here were both the use of profanity as well as other statements about its views of the Government's position on the motion to continue this trial." *Id.* at Tr. 36:17-19. The Court added that the gag order would not be limited to statements outside the courthouse but would "apply to statements regardless of the location of counsel." *Id.* at Tr. 38:4-6. The Court repeated its admonition that, "Any violations of the Court's order may result in the finding of contempt of

court, by the Court, and subject the violation to potential sanctions," and, "That will also be included in the Court's Order." *Id.* at Tr. 38:9-12.[10]

### L. The Court Called On Mr. Bolden To Address The Conduct That Was The Subject Of The First Show Cause Order And The Conduct That Would Soon Be Added To A Second Show Cause Order

After hearing argument on Ms. Mosby's Motion to transfer venue and ruling on that Motion, the Court turned to the September 30, 2022 Show Cause Order. The Court stated that it had "carefully reviewed Mr. Bolden's written response to the Show Cause Order, but also wanted to give him an opportunity in this setting to formally respond to that order." *Id.* at Tr. 71:12-15. Mr. Bolden asked if the September 30, 2022 Show Cause Order was directed to "defense counsel" generally or "me personally." *Id.* at Tr. 71:20-72:1. The Court replied that, "The Show Cause Order really is directed to you personally, and I believe it was your co-counsel who signed that particular thing." *Id*. at Tr. 72:2-4. The Court went on to state that, "… I don't have the name of the other attorney that's not present today," and, "So since he's not here, you would be the attorney to respond." *Id.,* at Tr. 72:4-7.

Mr. Bolden responded that the "large team" defending Ms. Mosby was "passionate, committed, bright, capable, and deeply committed" to their client. *Id.* at Tr. 72:8-12. He affirmed his acute awareness that "you, as a federal judge, and the federal court are to be respected at all times," and that, "if anybody on the defense team has gone awry of the Court rules … I want the Court to know and accept that there's nothing that this team has done in defense of Ms. Mosby that it purposefully did and certainly not knowingly did it." *Id.* at Tr. 72:25-73:12.

---

[10] The written Order, entered after the hearing, contained those same terms. ECF 171, Ex. "14" at 12 ("Any violation of this order may result in a finding of contempt of court").

Specifically addressing the references to the juror questionnaires in the Opposition, Mr. Bolden explained that the defense team did not believe that they had violated any prohibitions concerning "the confidentiality of the jurors" because the Opposition referenced "anonymous jurors" and because the reference to the four questionnaire answers was "in response to the Government's statements about juror answers to the questionnaires." *Id.* at Tr. 73:17-25. He reiterated that the Opposition argument "was in response to a motion" and that he believed that an "exception [to confidentiality] would allow defense counsel to counter what the Government had argued against that defense counsel." *Id.* at Tr. 75:3-7. Mr. Bolden also asked the Court to "consider" the gag order that was being entered that day as "more than sufficient [to accomplish the Court's objectives] as opposed to holding defense counsel in contempt … ." *Id.* at Tr. 75:12-19.

Without warning Mr. Bolden that the Court was about to issue a Second Show Cause Order that would cite Mr. Bolden for criminal contempt for his September 14th comments outside the courthouse, the Court stated that it wanted to give Mr. Bolden the "opportunity," if he wished "to further address" those statements. *Id.* at 75:22-76:1. The Court added that those comments have "been the subject of the discussion about the gag order" but that it "is of great concern to the Court, and I want to give you an opportunity to be heard on that, if you wish." *Id.* at 76:1-5.

Mr. Bolden repeated his apology to the Court. He added that it was "not my finest hour" and that he understood how "offensive" his expletive was. *Id.* at 76:6-14. He went on to say that the legal system is an "institution that I love and respect so much, and has been in my life from day one." *Id.* He also apologized for his comment about other prosecutions that might be brought, stating that he had not intended to be overzealous and that his outburst "came from my heart and not my head." *Id.* at Tr. 77:10-12. He concluded by explaining that he did not want to "run afoul

of this Court in any way, shape, form going forward," and he beseeched the Court to "allow the gag order to serve its purpose and find in your great discretion and humility that further action in regard to sanctions against defense counsel is unnecessary." *Id.* at Tr. 77:17-18, 78:8-11.

### M. The Court Announced That It Was Finding That Mr. Bolden Had Violated Local Rule 204 And That He Now Faced Punishment For His Criminal Contempt

The Court then announced that it had "carefully consider[ed]" Mr. Bolden's comments and his "written response," but that the Court had made the following conclusions:

> In the Court's view, Defense Counsel Bolden has violated Local Rule 204 by the following actions:
>
> One, disclosing confidential juror responses to the Court's questionnaire in the Defendant's September 29, 2022, public filing in this matter.
>
> Two, making certain extrajudicial statements during a press conference held on the courthouse steps on September 14th, 2022, in particular the reference to concerns about state, local and public government officials and employees needing to be concerned about the Government's prosecution of this matter.
>
> And thirdly, by using profanity during that same press conference while discussing these proceedings.
>
> The Court also finds that Defense Counsel Bolden violated Local Rule 201 by submitting the September 29, 2022, filing which he did sign, without the signature of any Maryland defense counsel, meaning a member of this Bar, which is also required under the local rules.

*Id.* at Tr. 79:19-80:11.

Addressing the four quotations from the answers to the jury questionnaires, the Court reiterated that the "filing on September 29th, 2022, violates Local Rule 204." *Id.* at 81:12-13. The Court explained that it took that aspect of its findings **with seriousness** because "disclosure of these confidential responses, in the Court's view, could create a chilling effect on the individuals

we will be calling upon in just a few days to truthfully respond to the questionnaire for this case, and also a chilling effect on any other potential juror who will be called upon by this Court to truthfully and carefully respond to the Court's questionnaire." *Id.* at Tr. 82:3-9.

### N. The Court Took A "Personal Moment" To Express How "Hurtful" It Was To Hear About Mr. Bolden's Profanity

The Court then returned to Mr. Bolden's September 14, 2022 comments outside the courthouse "to take a personal moment to how hurtful it was to hear profanity used on the courthouse steps." The Court's comment, in full, was:

> The Court wants to also take **a personal moment to say how hurtful it was to hear profanity used on the courthouse steps.** Hurtful to the employees of this institution, to the judges, and to the staff. Many have worked tirelessly in connection with this proceeding in particular to make it accessible and productive for counsel, for the Defendant, and for the public. **And to hear the use of profanity just moments after we concluded the proceeding was particularly hurtful** to this community and very troubling to the Court.

*Id.* at Tr. 83:8-16.

### O. The Court Expressed The Conclusion That Mr. Bolden Violated Local Rule 204 And That He Could Now Be Punished Summarily For Conduct Constituting Criminal Contempt

The Court stated again that the contempt proceedings against Mr. Bolden were based on violations of Local Rule 204 and that the Court believed that it could sanction Mr. Bolden summarily for direct contempt pursuant to Criminal Rule 42(b):

> Local Rule 204.6 provides that any violation of that rule may be treated as contempt of the Court and may subject the violator to disciplinary action by the Court. The Court concludes that any finding of contempt based upon the violations of Local 204 in connection with Defense Counsel Bolden's conduct would involve a criminal contempt sanction. So the Court consults Federal Rule of Criminal Procedure 42(b) which provides that the court may summarily punish a person who commits criminal contempt if the

judge saw or heard of the contemptuous conduct and so certifies. Given this, Defense Counsel Bolden is hereby notified of these violations and, again, he will be afforded an opportunity to address them in a further proceeding.

*Id.* at Tr. 86:12-24.

### P. The Court Immediately Issued Two Opinions That Mr. Bolden Violated Local Rules 204 And 201

The Court immediately filed two Memorandum Opinions and two Orders. The First Memorandum Opinion and Order addressed the Government's Motion for a gag order and the Defendant's Motion to transfer venue. ECF 171, Ex "14." The Court explained that it was issuing the gag order in large part because of Mr. Bolden's September 14th remarks outside the courthouse. *Id.* at 2-3, 8. The Court made the point that, "Defense Counsel Bolden's use of profanity, while standing on the courthouse steps, is also offensive to the Court and highly prejudicial to the due administration of justice." *Id.* at 8. The gag order recited that it was being issued pursuant to Local Rules 204 and 603 and that "[a]ny violation of this order may result in a finding of contempt of Court." *Id.* at 12. The Court also denied the Defendant's Motion to transfer venue "without prejudice." *Id.*

The second Memorandum Opinion formalized the Court's conclusions that:

> Defense Counsel Bolden violated Local Rule 204 by: (1) disclosing confidential juror responses in the Defendant's September 29, 2022, Filing; (2) making certain extra judicial statements during a press conference held on September 14, 2022; and (3) using profanity during the September 14, 2022, press conference. The Court also finds that Defense Counsel Bolden **VIOLATED** Local Rule by submitting the September 29, 2022, Filing, without the signature of Maryland Defense Counsel.

*In re Bolden*, ECF 1 at 1.

**Q.    The Court Issued Its Second Show Cause Order**

The Court also issued its Second Show Cause Order, this time directed to Mr. Bolden alone. *In re Bolden*, ECF 2. The Order reiterated the findings that Mr. Bolden had violated Local Rules 204 and 201. *Id.* It also ordered that, during the pendency of the *Mosby* case, Mr. Bolden "shall not" make "any filings" or "present argument to the Court" unless the filing is also signed by "an active member of good standing" of the Bar of the Court and unless "an active member in good standing of the Bar of this Court is also present at any court proceedings." *Id.*

The Order went on to state that it was proceeding further against Mr. Bolden for criminal contempt, under the authority of the provision of Local Rule 204.6 that "any violation of this Rule may be treated as a contempt of court and may subject the violation to disciplinary action of the Court." *Id.* For the first time in the three and a half months that the contempt matter against Mr. Bolden had been progressing, the Court took note of the fact that, "any finding of contempt based upon Defense Counsel Bolden's violations of Local Rule would involve the imposition of criminal contempt sanctions," and advised that, "Defense Counsel Bolden will be afforded notice of the alleged violations, an opportunity to be heard, and the protections that the Constitution requires, before the Court imposes any criminal contempt sanctions." *Id.* at 1-2. While this part of the Order, referring to the protections to be afforded Mr. Bolden, adverted to **"alleged violations,"** the Court **had already found that Mr. Bolden committed the violations** for which he was to be punished. The findings that Mr. Bolden was guilty of the violations were recited in the beginning of that same Order, in the accompanying Memorandum Opinion and in the Court's remarks at that day's hearing. Finally, the Order directed that:

> Defense Counsel Bolden shall **SHOW CAUSE,** in writing, **on or before January 31, 2023,** as to why the Court should not:
>
> (1)    Impose criminal contempt sanctions;

26

> (2) Make a criminal referral to the United States Attorney's Office for this District pursuant to Fed. R. Crim. P. 42; and/or
>
> (3) Revoke Defense Counsel Bolden's *pro hac vice* admission in *United States v. Marilyn J. Mosby,* 22-cr-0007.

*Id.* at 2.

### R. Mr. Bolden Withdrew From His Representation Of The Defendant

On January 19, 2023, two days after the entry of the Second Show Cause Order, Mr. Bolden, the three defense lawyers at the same firm as Mr. Bolden, and the other two defense lawyers all moved for leave to withdraw from their representation of Ms. Mosby. ECF 174. Mr. Bolden and the lawyers at the same firm averred that they believed that the entry of the Second Show Cause Order created a conflict of interest between their obligation to defend their client and the need for Mr. Bolden to defend himself. *Id.* at 1, ¶ 1. The other two lawyers averred that they had been acting in supporting roles and were not prepared to take the lead in the case. *Id.* at ¶ 2.

On January 27, 2023, the Court entered an Order granting the Motion of Mr. Bolden and other defense counsel to withdraw and appointing the Public Defender to represent Ms. Mosby. ECF 188. The Order mooted the issue whether Mr. Bolden should be allowed to remain in the case *pro hac vice.*

### V. WHERE, AS HERE, THE COURT HAS NOT ISSUED ANY CASE-SPECIFIC ORDER OR DIRECTIVE TO COMPLY WITH A LOCAL RULE, THE MERE VIOLATION OF A LOCAL RULE IS NOT PUNISHABLE BY CRIMINAL CONTEMPT

The Court cannot prosecute or punish Bolden for criminal contempt for alleged violations of Local Rules 204 and 201 because the District Court did not issue any case-specific directive to Bolden to comply with either of those Rules until after Bolden had already engaged in the conduct

in question. Local rules do not constitute "rules" within the meaning of the criminal contempt statutes, and they may form the basis for criminal contempt only if they are included in a specific order or directive addressed to a lawyer or party and if the lawyer or party thereafter violates the order or directive. Further, Local Rules 204 and 201, at issue, should be read narrowly to comport with those principles and with the rules of interpretation that Congress and the Supreme Court require for statutes or rules that a court might consider using as a basis for criminal contempt.

### A. The Statute Codified In 18 U.S.C. §§ 401 And 402 Confers The Authority For Prosecutions For Criminal Contempt

The authority to prosecute and punish for criminal contempt is derived from the statutes codified in 18 U.S.C. §§ 401 and 402. *See United States v. Murphy,* 326 F.3d 501, 503 (4th Cir. 2003). Section 401 provides that:

> A court of the United States **shall have the power to punish** by fine or imprisonment, or both, at its discretion **such contempt of its authority, and none other,** as - -
>
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
>
> (2) Misbehavior of any of its officers in their official transactions;
>
> (3) Disobedience or resistance to **its lawful writ, process, order, rule, decree or command.**

(emphasis added). Section 402 the companion to Section 401, in its relevant part, adds that:

> Any person, corporation or association willfully disobeying **any lawful writ, process, order, rule, decree, or command of any district court of the United States or any court of the District of Columbia,** by doing any act or thing therein, or thereby forbidden, if the act or thing so done be of such character as to constitute also a criminal offense under any statute of the United States or under the laws of any State in which the act was committed, shall be prosecuted for such contempt as provided in section 3691 of this title and shall be punished by a fine under this title or imprisonment, or both.

(emphasis added).

### B. The Commentators Agree That A Local Rule Is Not A "Rule," As That Term Is Used In §§ 401 And 402 And That, As A General Proposition, The Statute Does Not Permit Prosecutions For Criminal Contempt For Violation Of Local Rules

While §§ 401 and 402, employ the identical formulation, and both authorize a District Court to prosecute and punish, as criminal contempt, a violation of a **"rule,"** the commentators, following the majority of the Courts of Appeal that have analyzed these statutory provisions, have concluded that the word **"rule,"** as used in these statutory provisions, is synonymous with **"ruling"** and that it does not include general local rules promulgated by district courts:

> "The federal criminal contempt statute **does not permit convictions for violations of standing rules of court; local rules … do not constitute 'rules' within the meaning of the statute** and thus cannot serve as predicates for criminal convictions under the statute."

Williams, 15A Cyc. of Federal Proc. § 87:3, n. 6 (3d ed. and Jan. 2023 Update) (emphasis added).

Wright & Miller also state that:

> **"Local court rules do not constitute 'rules'** within the terms of § 402, so **violation of local court rules cannot support convictions** under § 402.

3A Fed.Prac. & Proc. Crim. § 704, n. 7 (4th ed. and April 2022 Update). In other words:

> **The criminal contempt statute, 18 U.S.C. § 402, does not permit convictions for criminal contempt for violations of standing rules of court.**

Levenson, *Federal Criminal Rules Handbook,* p. 677 (2020 ed).

### C. The Majority Of The Courts Of Appeal That Have Analyzed The Issue Have Agreed That A Local Rule Is Not A "Rule" Within The Meaning Of §§ 401 And 402

The issue was first considered in *In re Brown,* 454 F.2d 999 (D.C. Cir. 1971). There, the U.S. Court of Appeals for the District of Columbia sent a letter to a lawyer who was not admitted

to the bar of that court, soliciting him to represent indigent persons on appeal. *Id.* at 1001. Despite his informing the court that he was not admitted, the appellate court appointed the lawyer to represent an indigent person. As part of those appointed services, the lawyer filed and argued a motion in the district court for his client's release pending appeal. *Id.* at 1002. After denying the motion, the district judge, *sua sponte,* initiated a criminal contempt prosecution against the lawyer for unauthorized practice in violation of a local rule, and, after finding the lawyer in contempt for violating the local rule, sentenced him to 45 days in jail. *Id.* at 1002.

The Court of Appeals for the D.C. Circuit reversed the conviction. Judge Spottswood W. Robinson, III, speaking for the court, explained that the statute authorizing the prosecution and punishment for criminal contempt, which is written in the same language as when it was first adopted in 1831, was enacted for the purpose "delimiting" the power to punish for criminal contempt and confining the courts to the exercise of "the least possible power adequate to the end proposed." *Id.* (quoting *In re McConnell,* 370 U.S. 230, 233-34 (1962)). With those principles, as well as the language of § 401 in mind, Judge Robinson questioned whether the statute authorized prosecution and punishment for criminal contempt for violation of a local rule:

> The only … statutory basis upon which appellant's conviction could possibly be sustained is the third subdivision of Section 401. That subdivision authorizes federal courts to punish a criminal contempt any "[d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." At the time appellant appeared in the District Court, its [Local] Rule 96 specified that "[n]o person who is not a member of the Bar of" that court "shall engage in the general practice of law in the District of Columbia." The only theory on which subdivision 3 would underpin the conviction is that it was activated by a violation of [Local] Rule 96.
>
> That theory, however, like the others discussed herein, encounters difficulties. There arises, at the outset, the question whether a noncompliance with [Local] Rule 96 is a disobedience of a "rule" within the meaning of subdivision 3. Since every other directive which the subdivision speaks of-"writ, process, order, .. decree, or

> command"-is one which is specifically addressed to a particular
> person or group and one which traditionally has been enforceable
> through the contempt power, it may be that the "rule" to which
> subdivision 3 refers is the rule in the process sense-the rule to show
> cause, the rule nisi, and the like-rather than a general, standing rule
> of court, which usually draws its sanctions from other sources.

*Id.* at 1005-06. The Judge added that, "Use of the criminal contempt power to vindicate violations

of practice arguably would expand that power beyond congressional contemplation and in given

cases would produce monstrous results." *Id.* at n. 33. He went on to state that there was no need

for the court to rest its decision on that basis, however, because there was no evidence "adduced

at the contempt hearing that could sustain a finding beyond a reasonable doubt that appellant

entertained a contumacious intent." *Id.* at 1005, 1008.

The Ninth Circuit adopted and expanded on Judge Robinson's analysis in *United States v.*

*Kimsey,* 668 F.3d 691 (9th Cir. 2012), where it reversed a conviction for criminal contempt and

held directly that 18 U.S.C. § 402, which contains the identical operative language as § 401, does

not authorize the prosecution or punishment for criminal contempt for violations of a district

court's local rules or standing orders. The court observed that the Ninth and Seventh Circuits had

previously affirmed contempt convictions based on local rules without considering the issue, but

following well-accepted principles, gave those cases no weight because "'unstated assumptions on

non-litigated issues are not precedential holdings binding future decisions.'" *Id.* at 699 (quoting

*Proctor v. Vishay Intertechnology, Inc.,* 584 F.3d 1208, 1266 (9th Cir. 2009)).

After considering the opinion in *Brown,* the court declared that, "There are several reasons

why we conclude the D.C. Circuit's suggestion is correct." *Id.* at 699. *First,* the term "rule," as

used at the time "when § 401 and § 402 were originally enacted – could well have referred to a

judge's edict in a specific case rather than general, standing rules." *Id.* at 701. *Second,* applying

a basic canon of statutory interpretation, that "a string of statutory terms raises the implication that

the words grouped in a list should be given related meaning," the court noted that "the term 'rule' constitutes one of a 'string of statutory terms' … each of which most usually connotes a direct, situation-specific directive to a particular individual." *Id.* (quoting *S.D. Warren Co. v. Maine Bd. of Envt'l Prot.,* 547 U.S. 370, 378 (2006)). "Applying this commonsense canon," the court concluded that "the meaning intended was the one denoting context-specific legal pronouncement rather than the one denoting a generally applicable regulation." *Id.*[11]

*Third,* the court observed, "interpreting the term 'rule' to include local court rules would lead to absurd results, especially when § 402 is read in conjunction with § 401," the companion statute that provides generally for punishment for contempt and employs "identical lists" of the same terms. *Id.* at 702. If "rules" [were to] encompass local court rules, the contempt power could be used to punish failure to adhere to the most minor ministerial requirements. *Id.* "It is exceedingly unlikely," the court determined, "that Congress intended to authorize convictions of criminal contempt for disobeying [the many] ministerial, generally applicable requirements" that constitute a large part of the local rules of district courts. *Id.* at 702.[12]

---

[11] *See In re Minnis,* 56 S.Ct. 504 (1936), where the Supreme Court, used the word **"rule"** as synonymous with a specific "order" issued in a specific case, stated that it had issued a **"rule"** to a member of the Supreme Court Bar "to show cause" why he should not be disbarred, *See also Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 423 (1911), a contempt case using the word **"rule"** in the same sense (*i.e.,* "a **rule** to show cause issued, requiring each of the defendants to show cause why they should not be adjudged to be in contempt and be punished for the same."); *Cooke v. United States,* 267 U.S. 517, 537 (1925), a contempt case, where the Supreme Court using **"rule"** in the same sense, declared that, "it would seem to have been proper practice as laid down By Blackstone (4 Commentaries, 286), to issue a **rule to show cause,"** and "[t]he **rule** should have contained enough to inform the defendant of the nature of the contempt charged"). The Fourth Circuit has described the *Cooke* case as "[t]he seminal case on a defendant's due process rights in criminal contempt proceedings." *Brandt v. Gooding,* 636 F.3d 124, 133 (4th Cir. 2011).

[12] The Court was particularly concerned that, were it to rule otherwise, courts "could start having criminal contempt prosecutions for such trifling oversights as the omission of file numbers from the captions of the pleadings … and the failure of signing attorneys to include their email addresses on motions." *Kimsey,* 668 F.3d at 703.

D. **The Situation Is Different Where, Unlike The Present Case, The Court Specifically Directs A Lawyer To Comply With A Local Rule And The Lawyer Disobeys The Directive**

Stating that it "would be nonsensical" to allow prosecutions for local rules violations "without any case specific directive or warning by the district court," the court in *Kimsey* made it clear that a prosecution and punishment for criminal contempt may properly be brought for violation of a local rule if the district court first issues a case-specific order directing a party or lawyer (or otherwise) to comply with the local rule and if the party or lawyer thereafter fails to comply. *Id.* at 702-03. That was the situation in *In re Morrissey,* 168 F.3d 134 (4th Cir. 1999), where a lawyer was found guilty of criminal contempt for making extra-judicial statements about a pending criminal case on the eve of trial in violation of a local rule. The district judge entered an **earlier** order requiring the lawyer to show cause for a previous violation of the local rule and, at a hearing on that earlier order, **"the district judge reminded both parties of Local Rule 57 and promised harsh punishment for future violators."** *Id.* at 137. Under those circumstances, and fully consistent with the Ninth Circuit's decision in *Kimsey,* the Fourth Circuit affirmed the lawyer's conviction. *See also United States v. Cutler,* 58 F.3d 825, 828, 830-31 (2d Cir. 2008) (court affirmed conviction for criminal contempt where "[n]otwithstanding the court's pretrial admonition and orders to comply with local criminal rule, … [lawyer] spoke repeatedly to the media on the merits of the government's case against his client").[13]

---

[13] *Cf. United States v. Trudell,* 563 F.2d 889, 892 (8th Cir. 1977) (court affirmed conviction of trial spectator for criminal contempt where spectator repeatedly caused disturbances in hallway immediately outside courtroom, causing trial to be delayed, after Deputy U.S. Marshals showed defendant Local Rule requiring unobstructed hallway that was posted on the hallway wall and in defiance of further warnings that he would be arrested if he would not desist from preventing the jury from returning to courtroom by obstructing door to courtroom).

This Court implicitly recognized the added significance of a specific order to comply with a local rule when it announced at the January 17, 2023 hearing that it was entering the Order restricting extrajudicial statements by counsel pursuant to Local Rules 204 and 603. The Court took pains to admonish counsel that, "Any violations of the Court's order may result in the finding of contempt of Court, and subject the violator to potential sanctions," and "that will also be included in the Court's order." Ex. "13" at Tr. 38:9-12. *See also* ECF 171, Ex. "14" at 11-12 (stating specifically that the Order was being entered "[p]ursuant to Local Rules 204 and 603; admonishing that "[a]ny violation of this order may result in a finding of contempt of court;" and citing "L.R. 204" at the end of the paragraph (a)).[14]

**E.      In A Recent Case Concerning Whether The Attorney General Should Be Prosecuted For Violating The D.C. Local Rule That Is The Equivalent Of Local Rule 204, The Justice Department Argued, And The Court Agreed, That, In Light Of The *Brown* And *Kimsey* Cases, The Court Should Exercise Its Discretion Not To Prosecute For Alleged Violation Of A Local Rule**

The shoe was on the other foot in *United States v. Concord Management & Consulting LLC,* No. 18-cv-32-2, 2019 WL 7758635 (D.D.C. July 1, 2019) where the defendant in a criminal case sought charges for criminal contempt against U.S. Attorney General William Barr and Special Counsel Robert Muller, III for making extrajudicial comments about the pending criminal case in violation of the local rule prohibiting such comments. The court decided that contempt proceedings were not "an appropriate response to that violation," and, instead, "entered an order

---

[14] The Court followed a similar procedure when it reminded counsel and parties on the record that it was entering an Order pursuant to Local Rule 506.1, prohibiting the use of electronic devices at an upcoming motions hearing and thereafter entered a specific Order that prohibited such use and recited that, "Pursuant to Local Rule 506.1, the recording (both audio and video) and/or photographing of the proceedings in this matter is strictly prohibited." *See* Ex. "15" at Tr. 53:11-15; ECF 36, Ex. "16."

limiting public statements … moving forward and caution[ed] the government that any future violations of that order will trigger a range of potential sanctions." *Id.* at *1.

The Justice Department and the U.S. Attorney's Office for D.C., in defense of the Attorney General, argued that he did not act willfully, but that, if the court were of a different view, the court would have to confront the serious question, raised in the *Brown* case, that "violation of a local rule might not be punishable as criminal contempt under 18 U.S.C. § 401(3) … ." Ex. "17" at 10, n. 4. The Government cited and quoted the essential language of *Brown* and *Kimsey* cases. *Id.* The Government also asked that, if the motion for contempt was not dismissed for other reasons, the Government should be given the opportunity to provide "further briefing on the question." *Id.* With the conduct of the Attorney General at issue, the Government did not hesitate to urge that the violation of a local rule should not, in the ordinary case, provide the basis for prosecution or punishment for criminal contempt.

The court, declining to hold the Attorney General in criminal contempt, ruled that, "a number of factors [persuaded it] to exercise its discretion not to initiate criminal contempt proceedings at this time," the first being the grave doubt expressed in *Brown* "whether standing rules can serve as the basis for criminal contempt proceedings under 18 U.S.C. § 401(3)." *Concord Management & Consulting LLC,* WL 7758635 at *6. The court found it significant that:

> The Ninth Circuit has picked up where the D.C. Circuit left off and converted *Brown's* dicta into a holding. *See United States v. Kimsey,* 668 F.3d 691, 699 (9th Cir. 2012) ("conclud[ing] that the D.C. Circuit's suggestion is correct"). In deciding that § 401's companion provision, § 402, "does not permit convictions for criminal contempt for violations of standing rules of court," *id.* at 698, the *Kimsey* court examined contemporary legal usage of the term "rule," applied the *noscitur a sociis* canon, and observed that interpreting "rule" to include generally applicable court rules would lead to absurd results by converting violations of minor procedural and pleading requirements into federal crimes. *See is.* at 700-03.

*Id.* at *6.[15]

The *Concord Management* court also declared that there was such serious doubt regarding whether Congress has authorized the prosecution and punishment for criminal contempt for violation of local rules that, in the absence of specific orders requiring compliance, the court should decline to initiate or entertain such a prosecution in the exercise of its discretion. *Id.* at *7. The court took note of the decision in *Morrisey,* where the Fourth Circuit affirmed a conviction for criminal contempt when a lawyer made public statements about a case in violation of a local rule after the judge had ordered him to adhere to the local rule prohibiting such statement and to desist from such conduct. *Id.* The court also observed that, in the ordinary case, where there is no such case-specific order, a violation of a local rule is **so different** from the violation of a specific court order, and of such doubtful legality, that a court should not test the outer limits of its criminal contempt powers in such a case and should, instead, decline to pursue criminal contempt:

> In deciding whether to take that step in this case, the Court is mindful that wielding the contempt power to punish violations of generally applicable orders would, **at the very least, push the outer limits of the Court's contempt power.** *See Brown,* 454 F.2d at 1006 n.33 (warning that "[u]se of the criminal contempt power to vindicate violations of court rules of practice arguably **would expand that power beyond congressional contemplation** and in given cases would produce monstrous results"). **And in terms of culpability, a violation of a standing court rule does not involve the same affront to the Court's authority as would a violation of a specific court order directing a party to take or refrain from a particular action.** In the Court's view, this factor **counsels**

---

[15] The court noted that the Fifth Circuit, in *United States v. Herrera,* 252 F.3d 1355, 2001, WL 422627 (5th Cir. 2001) *(per curiam)* "reached a contrary conclusion, though not with the same degree of analysis." *Id.* at *6, n. 8. In fact, the court in *Herrera* engaged in **no** analysis but simply cited two prior circuit court cases, one, *Jones v. Central Bank,* 161 F.3d 311, 313 (5th Cir. 1998), that did not concern contempt at all, and the other, *Seymour v. United States,* 373 F.2d 629, 631 (5th Cir. 1967), where the issue was not raised and where the court simply **assumed** that the defendant was properly prosecuted. *See Herrera,* 252 F.3d at *3. *See also United States v. Minarik,* 842 F.2d 333, 1988 WL 24217, *3 (8th Cir. 1988) where court stated it "need not reach the issue" because there was no evidence of willfulness.

> **strongly against the initiation of contempt proceedings as a matter of discretion.**

*Id.* at *7 (emphasis added).

### F. The Supreme Court Has Instructed The Federal Courts To Interpret § 401 Narrowly And In Accord With The Congressional Purpose To Limit Prosecutions For Criminal Contempt

The narrow construction of § 401(3) expressed in *Brown* and *Kimsey,* and the concern about exceeding congressional purpose voiced in *Concord Management,* have a sound foundation in the legislative history of § 401 and in pronouncements of the Supreme Court. Congress enacted the Contempt Act of 1831, using the language that is now in Section 401(3), as a reaction to a conviction of a lawyer for criminal contempt for publishing a "criticism" of a decision "in a case in which the lawyer had appeared as counsel" and when "the lawyer was also counsel in other pending cases involving similar issues." *Cammer v. United States,* 350 U.S. 399, 406 (1956). In a series of cases beginning with *Nye v. United States,* 313 U.S. 33, 51 (1941), the Supreme Court emphasized that the legislative history, the early interpretations of the statute and the nature of contempt proceedings "admonish us … to recognize **the substantial legislative limitations** on the contempt power which were occasioned by the … episode" that caused the statute to be enacted. **"And,"** most relevant to the interpretation issue here, the Supreme Court instructed that, **"they necessitate an adherence to the original construction of the statute** … ." *id.* (emphasis added), and required that § 401 be given **"a narrow construction"** in light of the purpose for which it was enacted. *Cammer,* 350 U.S. at 404.[16] The *Brown, Kimsey* and *Concord Management* cases all

___

[16] *See also In re Michael,* 326 U.S. 224, 227 (1945) (the criminal contempt statute "represented a deliberate Congressional purpose drastically to curtail the range of conduct which courts could punish as contempt."); *In re McConnell,* 370 U.S. 230, 233-34 (1962) (Section 401 "is based on" the 1831 Act and should be applied in accordance with the "Congressional intent" at the time of the original enactment.).

interpret the language of Section 401(3) as it was originally understood and as the Supreme Court required, and as this Court must do as well.

### G. This Court Should Interpret Local Rules 204 And 201 Narrowly So That They Are Consistent With The Requirements Of The Governing Statutes And In Accord With The Principles Of Interpretation Dictated By The Supreme Court

Local Rules 204 and 201, the two local rules in question here, must be examined in light of these principles. Local Rule 204, relating to extrajudicial statements, states that, "Any violation of this Rule may be treated as a contempt of court and may subject the violator to the disciplinary action of the Court." *See* L.R. 204.6. To save that part of the Rule from being struck down as inconsistent with 18 U.S.C. § 401(3), and from being ruled invalid as beyond the authority granted by that governing statute, this Court should interpret the contempt provision of Local Rule 204.6 as only permitting proceedings for civil contempt, or at most, as only permitting criminal contempt proceedings for conduct that occurs after the entry of a case-specific direction to adhere to that Local Rule. *Cf. United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517-518 (1992) (plurality) (rule of lenity employed to interpret a civil tax provision because it had criminal applications); *Clark v. Martinez,* 543 U.S. 371, 381 (2005) (narrow interpretation adopted as "a tool for choosing between competing plausible interpretations," the broader of which "raises serious constitutional doubts").

Local Rule 201(b), which requires that an "active member in good standing of the Bar of this Court shall sign all documents" in a case in which a party is represented by an attorney admitted *pro hac vice,* differs from Rule 204 in that it does not contain a provision that a violation may be treated as a contempt of court. The inclusion of a contempt provision in one Local Rule, and the absence of such a provision in the other Rule, should be recognized as a deliberate differentiation. In the cases described above, moreover, courts were particularly concerned about

the prospect of using the criminal contempt power for violations of local filing requirements. *See Kimsey,* 668 F.3d at 702. It is reasonable to conclude that it was not contemplated that a simple, isolated failure to adhere to that rule, might constitute a criminal contempt.[17]

Irrespective of whether the local rules were framed with the possibility of criminal contempt in mind, the governing statute, 18 U.S.C. § 401, does not authorize the prosecution or punishment for criminal contempt for violation of local rules in the absence of a case-specific directive. Because there was no case-specific directive in the present case until after Mr. Bolden engaged in the conduct for which he is being asked to show cause, he cannot and should not be charged with criminal contempt for violations of local rules. Alternatively, the question whether proceedings for criminal contempt may be brought for violation of local rules is so doubtful that the Court should decline to proceed further in the exercise of its discretion.

**VI. THERE WAS NOTHING IMPROPER ABOUT THE DEFENSE TEAM'S BRIEF REFERENCE TO ANSWERS TO QUESTIONNAIRES GIVEN BY FOUR ANONYMOUS MEMBERS OF A FORMER JURY POOL. THE GOVERNMENT HAD MADE THE QUESTIONNAIRE ANSWERS AN ISSUE WITHIN THE CASE BY USING THE ANSWERS AS A BASIS FOR SEEKING A GAG ORDER, AND THE DEFENSE TEAM WAS ENTITLED TO REFER TO THE ANSWERS AS PART OF ITS OPPOSITION**

This Court cannot impose criminal contempt sanctions on Mr. Bolden based on the references to the answers to four jury questionnaires in the Opposition to the Government's Motion for a gag order. The Fourth Circuit has declared that answers to jury questionnaires may be disclosed when questions concerning the answers properly arise within the case. *See In re Baltimore Sun*, 841 F.2d 74 (4th Cir. 1988). The Government made the questionnaire answers an

---

[17] This Court's Order states that, "The Court concludes that any finding of contempt based upon Defense Counsel Bolden's violations of Local Rule 204 would involve the imposition of criminal contempt sanctions under *Cromer* [390 F.3d 812 (4th Cir. 2004)]." As such, the Court is limited by its own order not to consider criminal contempt sanctions for a violation of L.R. 201.

issue in the case when it summarized the answers and argued that they supported the Government's Motion for a gag order. Ex. "7" at 2. The defense team, in their Opposition, properly responded that the questionnaire answers compelled a contrary conclusion and illustrated their argument with four brief quotes from four anonymous jurors in seven lines of a single paragraph of the Opposition. Ex. "8" (under seal). These four answers were given by members of a former jury pool who were identified only by juror number, and the four quoted answers were a sample of the large body of answers that demonstrated disqualifying bias against Ms. Mosby and in favor of the Government. *Id.*

As shown by actions taken by the former Chief Judge of this District in a highly publicized case, the practice of at least some of the Judges of this District is that disqualifying answers to jury questionnaires are properly disclosed in public court filings when questions of disqualification, and the ability of parties to obtain a fair trial from an unbiased jury, are under consideration.

A. **The Use Of Disqualifying Answers To Jury Questionnaires Is Not Regulated In This District By Local Rule, The Jury Selection Plan, Standing Order, Or Any Order Entered In The Underlying Case**

It should be understood at the outset that the right of a defendant or defense counsel to use answers to jury questionnaires is not regulated by Local Rule, by this District's Jury Selection Plan, by any standing order or by any order in the underlying case. Local Rule 204 does not specifically address juror questionnaires or their use by counsel and, even if the Court could institute contempt proceedings for violations a Local Rule, Rule 204 is far too general to meet the requirement that criminal contempt must be based on disregard of a specific command. *See United States v. McMahon,* 104 F.3d 638, 642 (4th Cir. 1997) ("In order for a violation of a court order to constitute criminal contempt, constitutional principles of fair notice require that the order be "definite, clear and specific" enough so that it leaves "no doubt or uncertainty in the minds of those

to whom it was addressed") (quoting *Richmond Black Police Officers Ass'n v. City of Richmond, Virginia,* 548 F.2d 123, 129 (4th Cir. 1977)); *United States v. West,* 21 F.3d 607, 609 (5th Cir. 1994) (court order must be "sufficiently definite or specific to support a contempt citation"); *United States. v. Robinson,* 922 F.2d 1531, 1534 (11th Cir. 1991). Furthermore, the Jury Selection Plan for this District provides only that "**identifying information**, including but not limited to, **names, addresses, and employment** of prospective and sitting petit and grand jurors shall be maintained as confidential and shall be disclosed only to the extent permitted by Order of the Court." Jury Selection Plan, § XVII; *see id*. §§ XII, XIV. Counsel is aware of no specific order addressing the use of answers to juror questionnaires in this District or in the *Mosby* case.

### B. The Defense Team Referred To The Four Questionnaire Answers As Part Of A Legitimate Argument In Opposition To A Government Motion That Put The Substance Of The Questionnaire Answers At Issue Within The Case

It is beyond dispute that the seven lines of the Opposition that made reference to the four questionnaire answers were part of Ms. Mosby's Opposition to the Government's argument that the answers to the juror questionnaires showed that the prospective jurors were watching the case and the Government was entitled to a gag order that would limit further comments by Mr. Bolden. The Government argued that:

> The data from the Court recently collected from potential jurors via a questionnaire establishes that jurors are paying attention to media coverage of the case and will, therefore, be exposed to Mr. Bolden's extrajudicial statements. **The questionnaires provided by this Court indicate that a large portion of the individuals indicated that they had already made up their mind about the case based on press coverage.**

Ex. "7" at 2 (emphasis added). The "potential jurors" referenced by the Government were members of a former jury pool which was assembled in anticipation of a trial that had already been postponed.

To rebut the Government's assertion that the intense media coverage surrounding the case "risk[s] prejudicing [potential] jurors against the United States Attorney's Office," *id.*, the defense referred to the same responses to juror questionnaires invoked by the Government and used the four examples, identified only by their juror number, to illustrate that the data, in fact, indicates strong bias against Ms. Mosby. *See* Ex. "8" at 8. The thrust of this legitimate argument was that a gag order would not prejudice the jurors against the United States Attorney's Office because the responses to the questionnaires to which the Government cited in its Motion unequivocally demonstrate that media firestorm surrounding [the] case has *already* infected – perhaps irrevocably – the jury pool in Baltimore by turning a substantial number of potential jurors against Ms. Mosby. *Id.* at 2.[18]

C.  **The Fourth Circuit Has Declared That The Use Of Juror Questionnaires Is Governed By 28 U.S.C. § 1867(f), And That, Under The Statute, Questionnaire Answers May Be Disclosed When A Question Concerning The Same Has Properly Arisen In The Case**

The defense team's Opposition argument, including its brief references to four questionnaire answers, did not violate any requirement of confidentiality because it addressed a question concerning the answers to the jury questionnaires that arose within the case by virtue of the Government's reliance on those same answers to support its Motion for a gag order. The Fourth Circuit, stating that "information on [a] venire list is compiled from the completed questionnaires the prospective jurors file and is protected from disclosure by 28 U.S.C. § 1867(f)," further declared that this general protection exists only **"unless some question concerning the same should properly arise within the case."** *In re Baltimore Sun, Co.,* 841 F.2d 74, 75 (4th

---

[18] The Opposition concluded its argument by providing a statistical analysis that showed that approximately 65% of the answers showed that prospective jurors had heard of the case and approximately 30% had made up their minds and could not be impartial. *Id.*

Cir. 1988) (emphasis added). Here, the "question concerning" the answers to the jury questionnaire "properly arose within the case" when the Government made its general statements about the answers to the questionnaires in its publicly filed Motion for a gag order and argued that the answers to the questionnaires justified the relief that the Government sought. Ex. "7" at 2. Under the rule articulated in *Baltimore Sun,* it was thus entirely proper for the defense to make use of the questionnaire answers, in the manner that it did, to dispute the Government and to show that these answers actually supported the defense.

### D. Past Practice In This District Has Not Been So Protective Of Questionnaire Answers As The Show Cause Order In This Case Presumes

A more recent case in this District, *United States v. Byers,* 603 F.Supp.2d 826 (D.Md. 2009) (Bennett, J.), illustrates that the results of jury questionnaires may be discussed in an unsealed setting when such discussion is relevant to proceedings in the case and particularly when the issue concerns answers to questionnaires that demonstrate disqualifying biases. *Byers* was a highly publicized prosecution for a gang murder. In that case, the parties did not simply allude to the answers in memoranda but actually discussed them individually and by juror number in a telephonic pretrial hearing that was **not under seal:**

> After the completed questionnaires were returned, the parties convened on March 4, 2009 for a hearing, conducted on the record, in which the pool of jurors was narrowed by filtering out those responses that clearly evidenced bias or an inability to sit through the trial.

*Id.* at 834.

More significantly, and in a process devised by Judge Bennett of this District, the Judge and the attorneys, exchanged a series of **publicly filed** letters in which they referred to potential jurors by number and quoted from the disqualifying answers that the jurors had given to the

questionnaires. In the first of these **publicly filed** letters, sent on February 9, 2009, the Judge wrote that he had reviewed 292 questionnaires and proposed that 140 should be stricken for cause. Ex. "18." He listed the 140 potential jurors who gave disqualifying answers by their juror numbers and quoted from their answers. *Id.*

The Judge's **publicly filed** references to those prospective jurors and their questionnaire answers included the following:

0016 - could not follow presumption of innocence

\* \* \*

0022 - neighbor was brutally murdered by a black man during a robbery attempt; view of gang; could not decide case in a fair and impartial way

\* \* \*

0046 - reference to criminal defendants as "scum bags"

\* \* \*

0049 - has seen publicity on this case and would find it difficult to be impartial

0058 - response indicating racial bias (page 43)

\* \* \*

0079 - indications of bias – reference to individuals with tattoos being "punks"; bias against court system for "allowing too many criminals to roam the streets"

\* \* \*

0084 - has seen previous publicity about this case (page 24) and would believe a law enforcement officer over others (page 25)

\* \* \*

0131 - knowledge of this case; "was close to my home area"; not sure if she can follow presumption of innocence (page 26)

0133 - indications of racial bias (page 23); could not be impartial

\* \* \*

0166 - "I already feel that they are guilty" (page 25)

*     *     *

0216 -    knowledge of this case from news reports (page 24)

*     *     *

0246 -    familiarity with case from working at a television station; this case "angers me" (page 23)

0253 -    familiarity with case from media; would always vote for death penalty

*     *     *

0334 -    "would probably find them guilty pretty easily"

*     *     *

0461 -    employment problems; contends adverse relationship with Judge Bennett

*Id.* at 1-8.

Two months later, the Judge **publicly filed** a second letter, stating that he had received a second batch of 131 questionnaires and that he proposed striking 67 prospective jurors for cause. Ex. "19." The Judge again gave the juror numbers and quoted the 67 potentially disqualifying answers from the questionnaires. *Id.* On four subsequent dates, but prior to the telephonic hearing, the lawyers for the defendants, at the invitation of the Judge, likewise made **public filings** of prospective jurors who, in their estimation, gave disqualifying answers, identifying them by juror number and quoting from the questionnaire answers. Exs. "20" - "23."

Here, as in *Byers,* the disqualifying answers to questionnaires that the prospective jurors gave were relevant to decisions to be made in the case. The Government summarized the questionnaire answers in its Motion for a gag order to argue that prospective jurors were keeping themselves informed about the case and that a substantial number of them already made up their minds. The defense team, in its Opposition, summarized and analyzed the same questionnaire answers, and quoted from four illustrative answers, to make the point that prospective jurors had not only followed the case but that as many as 30% of them already decided that Ms. Mosby was

45

guilty. *Byers* and *Baltimore Sun* both instruct that there was nothing improper about the argument made in the Opposition and that it was perfectly proper for the defense team to refer to four illustrative disqualifying answers and to quote briefly from them.[19]

It is also important to recognize that any concern that might be voiced about prejudicial aftereffects of public references to answers to juror questionnaires would have been far more acute in *Byers* than here. In *Byers,* the Judge and the lawyers **publicly exchanged hundreds of quotations** from answers to juror questionnaires from prospective jurors who were part of the same pool from which the trial jury would be selected. These public exchanges of questionnaire answers took place on the eve of the trial of a highly publicized case. The letters containing these quotations were filed individually on the Court docket, making them stand out and inviting attention. In the present case, on the other hand, the defense team quoted from just **four** questionnaires in the midst of a memorandum that was submitted to the Court months before the case was scheduled to be tried. The questionnaire answers here were given by members of a previous jury pool from which the *Mosby* jury would no longer be selected. The references to the answers did not stand out and, of course, were not noted on the Court's docket. Just as the public quotation from hundreds of jury questionnaires in *Byers* was proper, and just as those public quotations in that case did not give rise to any actual reason to fear that they might cause prejudicial aftereffects, so too was the discrete quotation from four questionnaires in the Opposition in the *Mosby* case proper and not likely to create any prejudicial aftereffects.

---

[19] The Government itself recognized here that there is a difference between jurors who answer questionnaires by stating that they are biased, and from whom no further service is to be expected, from jurors who would be called for courtroom *voir dire*. At the January 17th hearing, the Government submitted that "those who have indicated on the questionnaires that they're biased should not even be coming to court. We shouldn't be wasting time with folks who have indicated that they're biased." Ex. "13" at Tr. 62:22-63:1.

**E.**   **Alternatively, Mr. Bolden Cannot And Should Not Be Punished For The References To The Jury Questionnaires In The Opposition Because There Were Fair Grounds For The Defense Team To Believe That It Was Proper To Make Such References In Opposition To The Government's Motion**

Alternatively, Mr. Bolden cannot be held in criminal contempt because it cannot be said that "there is no fair ground of doubt" as to whether, under the circumstances, the defense team was barred from making their limited references to statements of the four anonymous members of the former jury pool that they had already made up their minds that Ms. Mosby was guilty as a result of the adverse publicity that she had received. At the very least, the defense team had a reasonable basis for believing that the Government's Motion had made disqualifying responses a proper subject for reference and that the exception to nondisclosure applied to the situation in which they found themselves.

Over a century ago, the Supreme Court held that because contempt sanctions are a "severe remedy," a court cannot impose them if there are "fair grounds of doubt as to the wrongfulness of the Defendant's conduct." *California Artificial Stone Paving Co. v. Molitar,* 113 U.S. 609, 618 (1885). Interpreting this rule, the Supreme Court, the Fourth Circuit, and other federal appellate courts have found that, where there is a reasonable basis to conclude that the alleged contumacious conduct "might be lawful" (*e.g.,* where an order is vague or where exceptions to a rule *may* exist), a finding of contempt is improper. *Taggert v. Lorenzen,* 139 S.Ct. 1795, 1799 (2019). *See also Fidrych v. Marriott International, Inc.,* 952 F.3d 124 (4th Cir. 2020) (refusing to affirm the imposition of Rule 11 sanctions where it was not "entirely clear" that a Defendant's failure to file a timely answer as required by Rule 7 of the Federal Rules of Civil Procedure was sanctionable misconduct, given that the Supreme Court previously found exceptions to that Rule which might apply).

This reasonable conclusion that disclosure was permissible under *Baltimore Sun* and *Byers* provides fair grounds for doubt as to the alleged wrongfulness of the use of the juror questionnaires in the Opposition.  As such, a finding of criminal contempt is not permissible.

### VII.  MR. BOLDEN'S SINGLE USE OF A PROFANITY, UTTERED OUTSIDE THE COURTHOUSE AFTER THE CONCLUSION OF THE DAY'S PROCEEDINGS, AND NOT DIRECTED AT THE COURT OR ITS PERSONNEL, CANNOT AND SHOULD NOT BE PUNISHED AS A CRIMINAL CONTEMPT

Mr. Bolden's single use of the word "bull----" as part of an emotional outburst cannot be punished as a criminal contempt.  Mr. Bolden spoke outside the courthouse and did not direct his comment to the Court or to Court personnel.  Mr. Bolden realized immediately that he had behaved inappropriately and apologized to the Court at the earliest possible moment.  Whatever consequences Mr. Bolden may face as a result of his single, regrettable utterance, they cannot include prosecution for criminal contempt.

The leading case on punishment for profanity is *Eaton v. City of Tulsa*, 415 U.S. 697 (1974).  There, a witness in a trial, while testifying, described his assailant as "chicken s---."  He was summarily found in direct contempt of court.  *Id.*  The Supreme Court reversed the contempt conviction even though the profanity was uttered in the courtroom.  The court found that "this single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support the conviction of criminal contempt."  *Id*. at 698. The witness did not disrupt the courtroom, disobey a valid order, speak loudly, talk boisterously, or prevent the judge or any court officer from conducting their duties. *Id*. Therefore, criminal contempt was too powerful a response to ensure the administration of justice because the administration of justice had not been imminently threatened in the first place. *Id*.

Similarly, in *In re Oliphant*, 2022 WL 34144, No. 20-6163 (4th Cir. Jan. 4, 2022), the Fourth Circuit reversed the criminal contempt conviction of a courtroom spectator who exclaimed, in a single emotional outburst, "piece of s---!" as she was leaving the courtroom. *Id.* at *1. Her boyfriend had just been sentenced to 15 years imprisonment. *Id*. at *2. The spectator later denied that her comment was directed at the court. She was found in contempt of court for disrupting the administration of justice. *Id.* The trial judge found as a fact that the profane outburst "constituted misbehavior obstructing the administration of justice." *Id* The appellate court declared that the exercise of a lesser power, such as a warning or admonition, may have sufficed for the proposed end of ensuring the due administration of justice in the courtroom. *Id* at *4. The Fourth Circuit found it significant that the comment was a "single outburst" and a spontaneous, emotional reaction to a highly disappointing ruling. *Id.* at *4.

The appellate court also found it significant that the remark was uttered "when no court proceeding was being conducted and while she was leaving the courtroom." *Id.* All of those circumstances demonstrated an absence of requisite criminal intent, and, despite the trial judge's finding to the contrary, the Fourth Circuit held that "her contempt conviction cannot stand." *Id* *5. The appellate court went on to declare that, because of its holding that the single emotional outburst of profanity did not establish the intent necessary for criminal contempt, the Court did not need to consider the "other grounds for contesting [the] conviction," and that, "Those include that the conviction was constitutionally infirm under the Supreme Court's *Eaton* decision." *See* 415 U.S. at 698 (recognizing that "a single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support the conviction of criminal contempt") … ." *Id.* at n. 4.

49

A different situation is presented, of course, when the utterance of profanity in a courtroom is directed at the judge or court personnel or is part of an ongoing pattern of obstructive behavior that actually obstructs the activities of the judge or courtroom personnel. In *United Staes v. Peoples,* 698 F.3d 185 (4th Cir. 2012), a case that preceded *Oliphant,* "a former inmate," Peoples, who was pursuing "a number of § 1983 civil actions against prison officials," arrived late to court on the day of jury selection. *Id.* at 188. "Peoples became disruptive and disrespectful at the trial" causing the judge to admonish him that he would be held in contempt if he continued to act that way. *Id.* When the court admonished him again at the trial, he "noted his dissatisfaction with the admonishment by muttering disrespectfully." *Id.*

The following day, as the jury was entering the courtroom, Peoples left, muttering, "I was wanting to dismiss my sh-- anyway." *Id.* After the dismissal, when the judge went into the jury room to thank the discharged jurors, Peoples reentered the courtroom, interrupted the Deputy Clerk who was gathering documents to take to the judge, and repeatedly told her to "[t]ell Judge Currie get the f--- off all my cases." *Id.* He added that he wanted the judge to "straighten the f--- up." *Id.* at n. 1. The court affirmed Peoples' conviction for criminal contempt, finding that patterns of misbehavior, culminating in his accosting the courtroom clerk, "occurred in the courtroom and interrupted court personnel in their official duties and so obstructed the administration of justice." *Id.* at 192.

The Fourth Circuit, in *Peoples,* cited two cases to point out that a profane outburst, if it is aimed directly at the judge or courtroom staff, and if it takes place in the courtroom, may be punishable as a contempt. *Id.* at 190. In the first, *United States v. Marshall,* 371 F.3d 42, 48 (2nd Cir. 2004), the court asked if the defendant wanted to say anything before he was sentenced. The defendant responded that, "So all I can say is kiss my a-- and your wife can suck my d---." *Id.*

at 45.[20]  Affirming the defendant's conviction for contempt, the appellate court found that the statement "was calculated, egregious, in the presence of, and **directed at, the court."**  *Id.* at 46 (emphasis added).  Further, "It was self-evidently intended to show contempt for the court as was **not mitigated by any contemporaneous event that might have induced Marshall to surrender to an impulse soon regretted."**  *Id.* (emphasis added).  The court distinguished this case from Supreme Court's decision in *Eaton* and quoted the sentence from *Eaton* that, "Th[e] single isolated usage of street vernacular, not directed at the judge or any officer of the court, cannot constitutionally support the conviction of criminal contempt."  *Id.* at 48.  The court added that "in cases less egregious than the present one, a court should warn an attorney, party, or attendee that further instances of particular behavior will be deemed contemptuous before actually charging the offender with contempt."  *Id.*

In the second case upon which *Peoples* relied, *In re Sealed Case,* 627 F.3d 1235 (D.C. Cir. 2010) the district judge revoked a defendant's supervised release and sentenced him to imprisonment.  "During the hearing, the [defendant] repeatedly attempted to interrupt the district judge and, after the judge imposed his sentence, exclaimed 'F--- y'all.'"  *Id.* at 296.[21]  The court affirmed the conviction for criminal contempt, declaring that, "By its tendency to undermine order, a party's **deliberate cursing of a judge in open court** can[,] depending on the circumstances[,] readily be viewed as obstructive."  *Id.* at 1238 (emphasis added).  The court also observed that, "Misbehavior **in the courtroom,** at any time, carries the potential to obstruct justice."  *Id.* at 1237 (emphasis added).

---

[20] The profane words appear in full in the appellate opinion.  *Id.*
[21] This word appears in full in the appellate opinion.  *Id.*

The pronouncement by the Supreme Court in *Eaton,* the holdings of the Fourth Circuit in *Oliphant* and *Peoples,* and the cases on which *Peoples* relied, all establish that Mr. Bolden cannot be punished for criminal contempt for the single and isolated instance in which he uttered the word "bull----." *Eaton* at 698. His use of the expletive was part of an emotional reaction to a "contemporaneous event that … induced him to surrender to an impulse soon regretted." *Marshall,* at 46. While Mr. Bolden did himself no honor by using the expletive, he apologized to the Court at the earliest possible time. The outburst was not characteristic of Mr. Bolden's behavior over a long and distinguished career as a lawyer and civic leader. His use of the expletive occurred outside the courthouse after the Court had closed the day's proceedings, and not in the courtroom or even in the confines of the courthouse. *Cf. Eaton, Oliphant Peoples, Marshall* and *In re Sealed Case.* His language, though vulgar and profane, did not approach the levels of extreme offensiveness as the language used in *Oliphant, Peoples, Marshall* and *In re Sealed Case.* And, most decisively, his remarks were not directed at the Court or at any member of the Court's staff. *Eaton* at 698; *Oliphant* at *4; *Peoples* at 188, 192; *Marshall,* at 46; and *In re Sealed Case* at 1238.

**VIII. MR. BOLDEN CANNOT AND SHOULD NOT BE PUNISHED FOR CRIMINAL CONTEMPT BECAUSE THE COURT HAS ALREADY VINDICATED ITS AUTHORITY AND ENSURED THE FAIR ADMINISTRATION OF JUSTICE BY ACTIONS TAKEN IN THE UNDERLYING CASE**

This Court seeks to punish Mr. Bolden for criminal contempt for (1) disclosing answers to juror questionnaires in a September 29, 2022 memorandum; (2) making certain extra-judicial statements during a September 14, 2022 press conference; and (3) using profanity at that same press conference. The ultimate proposed end of the conviction of Mr. Bolden for contempt is said to be vindicating the authority of the court and ensuring the fair administration of justice. *See* Jan. 17, 2023 Tr. 82:3-83:7; 84:18-85:2. In considering whether to exercise its criminal contempt

power, the Court is obligated to use "only the least possible power adequate to the end proposed." *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 801 (1987). The Court has already accomplished the end proposed by taking actions in the case that have vindicated the authority of the Court and have ensured the fair administration of justice. Among other things, the Court struck the September 29, 2022 memorandum; Mr. Bolden apologized for the statements he made on September 14, 2022 and the Court accepted that apology; the Court issued a gag order preventing further extrajudicial statements; the Court warned Mr. Bolden that violation of the gag order would be punishable by criminal contempt; the gag order itself warns that violation is punishable for criminal contempt; Mr. Bolden made no further extrajudicial comments and Mr. Bolden and his entire defense team withdrew from their representation of Ms. Mosby. By taking these actions in the underlying case, the Court has already accomplished its ends by use of its power. It is no longer necessary or appropriate for the Court to deal further with Mr. Bolden.

> **A.** **The Criminal Contempt Power Must Be Exercised Sparingly And In Accord With The Principle That The Court May Exercise Only The Least Possible Power Adequate To Accomplish Its Ends**

The criminal contempt power is one of "self-protection." *Young*, 481 U.S. at 796. Criminal contempt proceedings protect the court "from insults and oppressions while in the ordinary course of its duties and [enable] it to enforce its judgments and orders necessary to the due administration of law and the protection of rights of suitors." *Id*. at 798 (citing *Bessette v. W.B. Conkey Co.*, 194 U.S. 324, 333 (1904)). This power "to punish disobedience to judicial orders" is considered "essential" to ensuring that courts have the means to vindicate their own authority and "to the due administration of justice." *Id*. at 796-98 (quoting *Ex parte Robinson*, 19 Wall. 505, 510 (1874)). *See also United States v. United Mine Workers of America*, 330 U.S. 258, 302 (1947) ("Sentences for criminal contempt are punitive in their nature and imposed for the purpose of vindicating the

authority of the court."). *See also Offutt v United States*, 348 U.S. 11, 14 (1954) (contempt power is "a mode of vindicating the majesty of the law").

Though the power to initiate criminal contempt proceedings is essential to maintain the validity of the court's authority, the contempt power is uniquely "liable to abuse." *Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 831 (1994) (quoting *Bloom v. State of Ill.*, 391 U.S. 194, 202 (1968)). Thus, criminal contempt proceedings are regarded with "disfavor" and should be "sparingly" instituted. *See Sacher v. United States,* 343 U.S. 1 (1952) (summary contempt power "always, and rightly, is regarded with disfavor…"); *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 450 (1911) (criminal contempt "is sparingly to be used"). *See Unique Apparel, Inc. v. Monies*, 1989 WL 50207 *3, 875 F.2d 316 (Table) (4th Cir. 1989) ("criminal contempt is an extraordinary procedure and should be invoked sparingly."). To that end, the Supreme Court has consistently held that the "exercise of that authority ***must*** be restrained by the principle that **'only the least possible power adequate to the end proposed'** should be used in contempt cases." *Young*, 481 U.S. at 801 (emphasis added) (quoting *United States v. Wilson*, 421 U.S. 309, 319 (1975)). Such has been the rule for well over 200 years. *See Spallone v. U.S.*, 493 U.S. 265 (1990) (court is obliged to use the "least possible power adequate to the end proposed.") (quoting *Anderson v. Dunn*, 6 Wheat. 204 (1821) (court is limited to the "least possible power adequate to the end proposed.")); *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (same); *Harris v. U.S.*, 382 U.S. 162, 165 (1965) (same); *In re McConnell*, 370 U.S. 230, 234 (1962) (same); *In re Michael*, 326 U.S. 224, 227 (1945) (same).

**B.**     **The Less Onerous Remedies Administered In the Course Of The *Mosby* Case Have Already Vindicated The Court's Authority And Provided For The Due Administration Of Justice**

Because courts are required to use the least power adequate to the end proposed, criminal contempt proceedings may be initiated only when a less drastic remedy "is deemed inadequate" to oblige the desired end. *Young*, 481 U.S. at 801. In *Bagwell*, the Supreme Court listed a host of means by which a trial court may "penalize a party's failure to comply with the rules of conduct regarding the litigation process" (and thus protect itself from 'impotence') without invoking its contempt power. 512 U.S. at 833. These include **"striking pleadings,** assessing costs, excluding evidence, and entering default judgment." *Id*.  The *Bagwell* court went on to suggest that "indirect contempts" do not ordinarily require exercise of the criminal contempt power and "properly may be adjudicated through civil proceedings… ." rather than criminal contempt proceedings. *Id.*

Here, as suggested in *Bagwell,* the Court has stricken the memorandum containing references that the court found objectionable. *Bagwell* instructs that this case was a proper exercise of power, far less than punishment for contempt, that sufficiently vindicated the authority of the court and satisfied the interests of justice.

Even when contemplating other sanctions often considered less serious than criminal contempt, the Supreme Court has dismissed orders to show cause where the end could be achieved by less onerous means.  In *In re Minnis*, 56 S.Ct.  503 (1936), the court found that an attorney's filing of a brief containing offensive and accusatory statements about the trial court judges was appropriately and sufficiently dealt with when the lawyer made a heartfelt apology that the court accepted.  *Id.*  The Supreme Court issued a rule requiring the attorney "to show cause why he should not be disbarred from the practice of the law in this Court for conduct unbecoming a member of the Bar of this Court." *Id.*  Presumably, the Supreme Court considered disbarment as

a means to achieve the proposed end of maintaining an acceptable standard of professional conduct within the Bar and keeping the trial court records free of offensive attacks upon trial judges. In response to the show cause order, the attorney "acknowledge[ed] his mistake, express[ed] his regret, disclaim[ed] any intent to reflect upon the judges to whom reference is made in said statements and completely apologiz[ed] therefore." *Id.* The Supreme Court accepted the attorney's apology, ordered that the offensive statements be stricken by the record, and discharged the show cause order. *Id.* Sanctions were not proper or necessary because the Supreme Court met the proposed end of maintaining professional conduct, and upholding the dignity of the court, by striking the offensive pleading and accepting the attorney's acknowledgment of his mistake, expression of regret, and apology. Without imposing drastic sanctions, this remedy adequately protected the Court "from insults and oppressions", vindicated its authority and preserved the administration of justice.

Here, as in *Minnis,* Mr. Bolden uttered offensive language, but, unlike *Minnis*, did so in a momentary outburst outside the courthouse on September 14th. On the other hand, the lawyer in *Minnis* deliberately put his outrageous remarks in a brief that he filed with the Supreme Court after due deliberation. 56 S.Ct. 503. Unlike Mr. Bolden, who reacted impulsively to what he perceived as personal attacks that the Government had employed to obtain a postponement, the lawyer in *Minnis* directed his offensive remarks at the trial judges who had heard the case. Even so, the Supreme Court determined that the striking of the brief and the lawyer's apology, when accepted by the court, was punishment enough. In the present case, Mr. Bolden, on his own, apologized to the Court for his outburst at the earliest possible moment, the Court accepted his apology, and the Court struck the memorandum that contained the statements about four answers to juror

questionnaires.  *In re Minnis* instructed that, in light of Mr. Bolden's apology, and its acceptance by the Court, further proceedings to sanction or punish Mr. Bolden are not warranted.

Applying the "least possible power adequate to the end proposed" standard, the Fourth Circuit and other federal appellate courts consistently hold that it is improper to punish alleged contemnors with criminal contempt where "less onerous remedies should have been employed by the district judge." *Unique Apparel, Inc. v. Monies*, 1989 WL 50207 *3, 875 F.2d 316 (Table) (4th Cir. 1989); *See also United States v. Neal*, 101 F.3d 993, 996 (4th Cir. 1996) ("only the least possible power adequate to the end proposed should be used in contempt cases") (citations omitted); *In re Brown*, 454 F.2d 999 (1971) (courts should "reserve exercise of [the criminal contempt] power to conduct acutely demanding it.").  In *Unique Apparel*, a district judge summarily found a defendant in criminal contempt for failing to personally appear at a hearing on the enforcement of a settlement agreement.  WL 50207 at *3.  The clerk of the court and the judge himself called the defendant and personally ordered him to appear.  The Fourth Circuit held that even the defendant's deliberate violation of a direct order was not sufficient to justify criminal contempt proceedings because  the district court was nonetheless "able to conduct and complete the plenary hearing and fully dispose of all issues" in the defendant's absence.  *Id.*  Reversing the conviction of the defendant for criminal contempt, the Fourth Circuit held that "while [the defendant's] conduct may well have justified the imposition of some sanction, it did not support a basis for a finding of criminal contempt." *Id.*

Particularly relevant to the case at bar is *United States v. Koubriti*, 305 F.Supp.2d 723 (E.D. Mich. 2003) a prosecution for conspiracy to provide support to terrorists.  After both the prosecution and the defense consented to a gag order, the Attorney General made successive extrajudicial public statements that defendants were "suspected of having knowledge of the

September 11th attacks" and that a cooperating witness's testimony was of "substantial value." After making the first statement, the Justice Department promptly retracted the statement, and the Assistant Attorney General apologized to the court and represented that no further incidents would occur during the case. *Id*. at 730. After making the second statement, a Justice Department spokesperson addressed the remarks and disclaimed that the Attorney General had any intention "to contravene the judge's wishes regarding publicity." *Id*. at 736. After the trial, the defendants moved the court to issue a show cause order as to why the Attorney General should not be held in contempt for violating the gag order. *Id*. at 737. Nearly two months later, the Attorney General formally issued an apology to the Court by means of a letter, in which he admitted that he should not have made the remarks, apologized for them, and assured the court and the public that he would "make every effort to ensure that the difficulties occasioned in this instance will be avoided in the future." *Id*. at 737-739. The Court found the retraction of the statement and the apology compelling, stating that "the Court places great weight on this expression of regret, as well as the Attorney General's personal assurance that he will make every effort to ensure that his public statements in the future do not include inappropriate references to pending cases." *Id.* at 764. The court concluded that, under the totality of the circumstances, the Attorney General's conduct warranted only judicial admonition. *Id*.

Each of these alternate remedies that were employed here, and in the cases cited above, vindicated the authority of the Court and provided for the due administration of justice, without imposing the "dark stain" of criminal contempt. *See United States v. Mottweiler,* 82 F.3d 769 (7th Cir. 1996). This Court has already deployed the lesser remedies that the Supreme Court and other federal courts deem sufficient to vindicate the authority of the court and to assure the fair

administration of justice.  Here, as in those cases, there is no occasion for further punishment by criminal contempt or otherwise.

**IX.    IF MR. BOLDEN WERE SUBJECT TO CRIMINAL CONTEMPT, THE COURT WOULD NOT BE PERMITTED TO PROCEED WITH SUMMARY DISPOSITION UNDER SUBSECTION (b) OF RULE 42, FED. R. CRIM. P., BUT WOULD BE REQUIRED TO BEGIN ANEW WITH PROCEEDINGS THAT COMPLIED WITH SUBSECTION (a) OF THAT RULE**

Even if violation of the Local Rules were punishable as criminal contempt (which it is not, as set forth in previous sections), the Court would be required to employ the procedures set forth in Federal Rule of Criminal Procedure 42(a) for nonsummary, indirect contempt.  Subsection (a) provides for the process that must be followed in the typical criminal contempt case where the judge did not personally witness the allegedly contemptuous conduct.  Subsection (a) would govern here because it is well settled that Mr. Bolden's allegedly violative conduct, a statement made outside the courthouse and the filing of a memorandum, cannot be punished summarily.

It appears that the Court, during the January 17th hearing, misread the limitations on summary contempt.  This misconception is demonstrated by the Court's recitation of the questions for Mr. Bolden to answer in the Second Show Cause Order:

> Local Rule 204.6 provides that any violation of that rule may be treated as contempt of the Court and may subject the violator to disciplinary action by the Court.  The Court concludes that any finding of contempt based upon the violations of Local 204 in connection with Defense Counsel Bolden's conduct would involve a criminal contempt sanction.  So the Court consults Federal Rule of Criminal Procedure 42(b) which provides that the court may summarily punish a person who commits criminal contempt if the judge saw or **heard of** the contemptuous conduct and so certifies. Given this, Defense Counsel Bolden is hereby notified of these violations and, again, he will be afforded an opportunity to address them in a further proceeding.

*See* Ex. "13" at Tr. at 86 (emphasis added).  Based on this misreading of Rule 42(b), the Court asks in its Second Show Cause Order why it should not immediately "impose criminal contempt sanctions," *i.e.*, why it should not summarily punish Mr. Bolden.

The Court's suggestion that it can summarily punish Mr. Bolden for what the Court **"heard of,"** as opposed to what the Court saw or heard directly, is a fundamental misreading of the applicable rule.

A.    **The Text of 18 U.S.C. § 401 And Federal Rule Of Criminal Procedure 42(b) Do Not Support Summary Contempt for What the Court "Heard Of"**

The applicable criminal statute and federal Rule, from which the Court's jurisdiction derives, are entirely inconsistent with the Court's asserted basis for holding Mr. Bolden in summary contempt.  Specifically, 18 U.S.C. § 401 provides, in relevant part, as follows:

> § 401.  Power of Court
>
> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as ---
>
> (1) Misbehavior of any person **in its presence or so near thereto as to obstruct the administration of justice**…

(emphasis added).  Thus, under the plain language of the statute, the Court only has jurisdiction to enter summary contempt where the Court can observe the behavior directly or where the behavior occurs "so near" the Court as to obstruct justice.  This, by definition, cannot be done on the steps outside the Court or on a Court filing.

The language of Rule 42(b) regarding summary contempt is even narrower and most clearly inconsistent with the Court's statement:

> **(b) Summary Disposition.**  Notwithstanding any other provision of these rules, the court (other than a magistrate judge) may summarily punish a person who commits criminal contempt **in its presence** if

60

> the judge **saw or heard the contemptuous conduct** and so
> certifies…

(emphasis added). The Court's statement, that it can issue summary contempt for conduct it

**"heard of,"** clearly adds a word to the Rule and changes its meaning altogether. Rule 42(b) makes

clear that the Court needs to have seen or heard the conduct when it occurred, and not after the

fact, because the Rule requires that it happened "in its presence."

**B.      Case Law Interpreting Summary Contempt Makes Clear That,
         To Qualify For Punishment By Summary Contempt, The
         Conduct Must Have Been In Front Of The Court, Or At Worst,
         In The Hallway Directly Outside The Courtroom**

**1.      There Can Be No Summary Contempt For What
          Happened On The Courthouse Steps**

The Supreme Court's seminal case on criminal contempt addressed the limitations on the

right of a trial court to exercise summary contempt power. *See Cooke v. United States*, 267 U.S.

517, 534-35 (1925). There, the Court explained that:

> Where the contempt is committed **directly under the eye or within
> the view of the court,** it may proceed 'upon its own knowledge of
> the facts, and punish the offender, without further … proof, and
> without issue or trial any form …; whereas, in cases of misbehavior
> of which the judge cannot have such personal knowledge, and **is
> informed thereof only by the confession of the party, or by the
> testimony under oath of others,** the proper practice is, by rule or
> other process, to require the offender to appear and show cause why
> he should not be punished.

*Id*. at 535 (citations omitted) (emphasis added). *Cooke* concerned a letter submitted by a party to

the trial judge that appeared to threaten the judge if he did not recuse himself from future cases

involving that party. *Id.* at 391. The Supreme Court found this was not an example of a

circumstance allowing for summary contempt, and ultimately reversed on the ground that the

contemnor was entitled to more process than given below.

In *Harris v. United States*, 382 U.S. 162 (1965), the Supreme Court clarified that "in the presence" did *not* extend as far as the grand jury room. There, the contemnor was a witness before the grand jury who refused to answer questions, citing his rights under the Fifth Amendment. *Id.* at 164. When the Government gave him immunity, he continued to remain silent. *Id.* Even when brought before the court and directed by the judge to answer, he still refused. *Id.* This refusal did not subject him to summary contempt, however, because he was being questioned in the grand jury room and committing the allegedly contemptuous conduct there. *Id.* To rectify the situation, the Government and the court devised a plan to bring the witness into the courtroom and for the same questions to be asked in the presence of the judge. *Id.* at 164-65. When the witness again refused to answer, he was found summarily in contempt. *Id.* On appeal, the Supreme Court rejected this method of subjecting the witness to summary contempt, and reversed the conviction and punishment. The Court determined that:

> [R]eal contempt, if such there was, was contempt before the grand jury – the refusal to answer to it when directed by the court. Swearing the witness and repeating the questions before the judge was an effort to have the refusal to testify 'committed in the actual presence of the court' for purposes of Rule 42(a).[22] It served no other purpose, for the witness had been adamant, and had made his position known. The appearance before the District Court was not a new and different proceeding, unrelated to the other. It was ancillary to the grand jury hearing and designed as an aid to it.

*Id*.

The *Harris* decision stands in contrast to that of the Supreme Court ten years later, in *United States v. Wilson*, 421 U.S. 309, 315 (1975), where a witness' refusal to testify **at a trial** was deemed to fall within the statute and rule for summary contempt because the refusal occurred

---

[22] The summary contempt provision in Federal Rule of Criminal Procedure 42 was previously located at Rule 42(a). As noted above, under the current rules, it is located at Rule 42(b).

at its inception in the courtroom in the presence of the trial judge. *See id.* ("All that is necessary is that the judge certify that he 'saw or heard the conduct constituting the contempt and that it was committed in the actual presence of the court'"). Similarly, while the Supreme Court is unwilling to venture as far as the grand jury room, one Circuit Court of Appeals has found that a spectator at the entrance to the courtroom, who attempted to block the jury from entering the courtroom, was subject to summary contempt. *See United States v. Trudell*, 563 F.2d 889, 892 (8th Cir. 1977).

A district court cannot, as the Court here indicated, hold a person in summary contempt based on something the Court heard from someone else or from elsewhere. For example, in *In re Stewart*, 571 F.2d 958 (5th Cir. 1978), a Mississippi juror complained to a trial judge that his employer was retaliating against him at work for taking time off to serve on the jury. Based on what the trial judge heard, the employer was arrested and brought before the judge in a proceeding where the employer called no witnesses but was examined by the Court, the prosecutor and the employee. At the conclusion of the summary hearing, the Court found the employer guilty of contempt, fined him $100, sentenced him to 6 months' probation, and required him to restore the employee to the status he held prior to the jury duty service. In analyzing the conduct under 18 U.S.C. § 401, the Fifth Circuit held that the employer could not be punished through use of the summary procedures because the acts occurred outside the courthouse and the court merely heard of them when the juror complained.

The Fourth Circuit adopted the *Stewart* opinion as defining the geographic limits of summary contempt. *See United States v. Peoples*, 698 F.3d 185, 192 (4th Cir. 2012) (citing *Stewart* for geographic limits). Clearly, Mr. Bolden's comments outside the courthouse were beyond the geographic limits for summary contempt. Further, the Court could not have expanded the limits

on its summary contempt power by "hearing of" Mr. Bolden's comments or by having Mr. Bolden speak of those comments at a subsequent hearing.

### 2. There Can be no Summary Contempt for the Content of Court Filings

For the same reasons set forth above, summary contempt is unavailable for allegedly contumacious court filings. Indeed, the *Cooke* case, discussed above, is itself a case concerning a letter that a disappointed litigant delivered to the court. The offensive conduct in *Cooke* was by a party who had just lost a trial with a verdict of $56,000, and the trial judge was set to hear other related lawsuits against him. In anticipation of those trials, the party submitted a letter to the Court with harsh language, suggesting that the trial judge was biased and that if he did not recuse himself, he would be subject to a motion to disqualify. The Court, speaking through Chief Justice Taft, held that the offending party could not be punished summarily because "there is no such right or reason in dispensing with the necessity of charges and the opportunity of the accused to present his defense by witnesses and argument." 267 U.S. at 536.

Fourth Circuit precedent is to the same effect. In *Kelley v. United States*, 199 F.2d 265 (4th Cir. 1952), where the contemnor was engaged in the unauthorized practice of law and was acting as an attorney for unrepresented persons, the Fourth Circuit found that as "the filing of papers in the clerk's office was not a matter seen or heard by the District Judge, it was not a contempt punishable summarily." *Id*. at 266.[23] Likewise, in *Cromer v. Kraft Foods North America, Inc.*, 390 F.3d 812 (4th Cir. 2004), a *pro se* litigant, after entering into a settlement agreement, filed a torrent of motions, one after the other, while ignoring the direct order of the trial

---

[23] The defendant also attended hearings in the courtroom while advising unrepresented persons. This conduct, unlike the filing of papers with the Clerk was "in the presence of the court." *Kelley*, 199 F.2d at 266-67.

court that such filings cease. *Id*. at 815-16. After three years of frivolous filings, the magistrate judge instituted contempt proceedings. *Id*. at 816. The Fourth Circuit considered whether such proceedings could be for summary contempt and concluded they could not because the behavior, which consisted entirely of filing papers with the clerk, "occurred outside of the Court and therefore triggers the procedural protections afforded in proceedings for so-called 'indirect contempt'…" *Id*. at 820.

Similarly, in *Brandt v. Gooding*, 636 F.3d 124, 134 (4th Cir. 2011), in a legal malpractice lawsuit concerning an allegedly botched real estate transaction, the plaintiff presented as a record in the case a letter that was fraudulent. The Fourth Circuit found that this conduct was not susceptible to a summary contempt procedure because summary contempt is only proper "where an individual's misconduct not only occurs 'within the 'personal view' of the judge 'under his eye,' … but also 'disturbs the court's business.'" *Id*. at 134 (citations omitted).

Considered together, these cases make clear that the filing of the September 29 Opposition cannot be construed as having occurred "in the presence" of the Court, and any deficiencies in the Opposition cannot therefore be punished through a summary contempt proceeding. If it were permissible for the Court to proceed with contempt proceedings (which it is not) those proceedings would have to be pursued pursuant to the procedures of Rule 42(a).[24]

### C. The Criminal Contempt Proceedings That Have Taken Place Over The Past Four Months Have Not Complied With Either Rule 42(a) Or Mr. Bolden's Constitutional Rights

---

[24] Summary contempt has also been said to be reserved for instances where there is an "open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public," that if it "is not instantly suppressed and punished, demoralization of the court's authority will follow." *See Cooke*, 267 U.S. at 536 (1925); *see also Wilson*, 421 U.S. at 315 (explaining that summary contempt is appropriate for a trial witness who refuses to answer questions, even with immunity, because that refusal obstructs the court proceedings and the administration of justice); *Brandt*, 636 F.3d at 134 (summary contempt must be such that it "disturbs the court's business").

Even if it were permissible for the Court to bring criminal contempt proceedings against Mr. Bolden, the proceedings that have taken place since the issuance of the September 30, 2022 Show Cause Order have not complied with either the requirements of Rule 42(a) or Mr. Bolden's constitutional rights under the Fifth and Sixth Amendments. These proceedings could not be the basis for punishing Mr. Bolden for criminal contempt even if the Court had authority to base criminal contempt on a violation of a Local Rule.

The problem that confronts the Court at this juncture is that the Court has already issued two Show Cause Orders for criminal contempt and neither of them complied with the requirements of Rule 42(a) for contempt proceedings for indirect criminal contempt. The Second Show Cause Order, which this Answer addresses, apparently proceeds on the mistaken notion that it was permissible for the Court to take evidence and to make findings of contumacious and violative behavior, without complying with the requirements of Rule 42(a) or complying with Mr. Bolden's constitutional rights. The Second Show Cause Order was entered on the mistaken assumption that, Mr. Bolden's rights, including his right to counsel, began only at the punishment phase. *See In re Bolden,* ECF 1 at 6 (informing Bolden that he now has "the right to counsel" and affording Mr. Bolden "an opportunity to be heard before the Court imposes any criminal contempt sanctions in this matter.").

One of the greatest difficulties in going forward is that Mr. Bolden was entitled to be notified of his right to counsel, and was entitled to the protections of the Constitution and Rule 42(a), when the Court issued its First Show Cause Order on September 30, 2022 and not after the Court has already found that he committed the violations for which the Court stands ready to punish him. In *Richmond Black Police Officers Ass'n v. City of Richmond, Va.,* 548 F.2d 123, 126 (4th Cir. 1977), the Fourth Circuit reminded that "it is essential that a determination be made at

the earliest practical time regarding the contempt that is allegedly involved in a case in order that the proceedings which are held thereafter are conducted in a manner to satisfy the appropriate rules of procedure, the requirements of the various statutes and accord due process to the parties." The appellate court emphasized that Rule 42(a) (then Rule 42(b)) prescribes "the precise procedure" that must be followed.[25] *See also Young,* 481 U.S. 787, where the Court made it clear that the constitutional rights of a person charged with criminal contempt do not begin at the punishment phase, but at the start of the process, when it declared that, "[T]his Court has found that defendants in criminal contempt proceedings must be presumed innocent, proved guilty beyond a reasonable doubt, and accorded the right to refuse to testify against themselves … ." *Id.* at 798.

Since issuing the September 30th Show Cause Order, the Court has taken evidence informally through the written answer that was required to be filed and through the statements that the Court called on Mr. Bolden to make at the January 17, 2023 hearing. The Court also went so far as to assess that evidence, crediting some and rejecting other parts, and found violations that it deems sufficient to punish as criminal contempt. By taking these actions without complying with Rule 42(a) or adhering to Mr. Bolden's constitutional rights, the Court, unfortunately, went beyond the limits of what it was entitled to do itself and has inadvertently placed itself in the roles of "both prosecutor and decision maker in [this] criminal contempt proceeding." *Cromer,* 390 F.3d at 820. The Court has been taking actions in this criminal contempt matter, pursuant to the two Show Cause Orders, for more than four months and has gone so far as to find that Mr. Bolden committed

---

[25] Prior to 2002, Rule 42 set out the procedure for direct contempt in subsection (a) and the procedure for indirect contempt in subsection (b). In 2002, the Advisory Committee inverted subsections (a) and (b). That is, "Former subsection (a), which covered summary dispositions, was moved to present Rule 42(b), and former subsection (b), which covered dispositions after notice, was moved to present Rule 42(a)." Wright & Miller, 3A Fed.Prac. & Proc. Crim. § 701 (4th ed. and April 2022 Update).

the alleged violations for which the Court now seeks to punish him.  Those actions and findings, all of which took place without Mr. Bolden having been afforded the protections of Rule 42(a) and the Constitution, cannot provide the basis for further steps in this criminal contempt case even if Mr. Bolden could be prosecuted for criminal contempt for allegedly violating a Local Rule.  *Cf. United States v. Neal,* 101 F.3d 993, 997, where the Fourth Circuit quoted the admonition of Justice Scalia, in his concurring opinion in *Bagwell,* 512 U.S. at 840, that the idea "[t]hat one and the same person should be able to make the rule, to adjudicate its violation, and to assess its penalty is out of accord with our usual notions of fairness and separation of powers," and where Justice Scalia further observed that "it is worse still for that person to conduct the adjudication without affording protections usually given in criminal trials."

The failure to comply early with Rule 42(a) or to adhere early to Mr. Bolden's constitutional rights is consequential.  Among other things:

(1).   If the Court had followed Rule 42(a) when it first ordered Mr. Bolden to show cause why he should not be sanctioned with criminal contempt, the Court would have confronted early the issue whether the contempt proceedings should take place before a different District Judge as required by subsection (a)(3). The Court would have had to examine whether it had put Mr. Bolden's emotional outburst aside when it accepted his apology on September 15, 2022, or whether, as the Court exclaimed in the "personal moment" on January 17, 2023, four months later, the Court continued to be "very troubl[ed]" about what it regarded as a "hurtful" affront.  If the latter were the case, as is now evident, the Court would have disqualified itself as required by Rule 42(a)(3).

(2).     If the Court had accorded Mr. Bolden his constitutional rights, it would have informed Mr. Bolden of his need to engage counsel at the end of September, and counsel could have brought to the Court's attention, in a timely fashion, when they could have been most helpful, the legal impediments to prosecuting and punishing Mr. Bolden for criminal contempt.

(3).     If the Court had accorded Mr. Bolden his constitutional rights, the Court would have recognized that any findings that Mr. Bolden committed any violation would have to be made beyond a reasonable doubt and that those findings, made beyond a reasonable doubt, would have had to include that it was Mr. Bolden (and not the defense team generally) who made the decision to file the Opposition publicly, that Mr. Bolden filed or aided and abetted the public filing, and that Mr. Bolden, in so doing, acted with willful and deliberate criminal intent.

These and other unfortunate consequences resulted from pursuing contempt proceedings without complying with the teachings of the *Richmond Black Police Officers Ass'n* case, the *Neal* case or the *Cromer* case, and without conforming to the command of the Supreme Court in the *Young* and *Bagwell* cases.[26]

---

[26] There are also serious double jeopardy implications in this case due to the Court issuing multiple Show Cause Orders. The first Show Cause Order, entered on September 30, 2022, compelled defense counsel, including Mr. Bolden, to show cause why they should not be subject to the penalty for violation of Local Rule 204.6 by October 7, 2022. Ex. "9." The penalties for violation of Local Rule 204.6 include contempt. The October 7, 2022 Response to the Show Cause was considered, along with a statement by Mr. Bolden, at the January 17, 2023 hearing, and the Court entered findings that the Court incorporated into its second Show Cause Order. This series of events, *i.e.*, being subject to a show cause order, submitting arguments and evidence, and participating in a hearing, arguably subjected Mr. Bolden to jeopardy, precluding further proceedings. *See United States v. Dixon*, 509 U.S. 688, 696 (1993) (double jeopardy applies to criminal contempt); *Finch v. United States*, 433 U.S. 676 (1977) (jeopardy attached based on stipulations and findings by the Court that the crime could not have been committed); *Harris v. Young*, 607 F.2d 1081, 1087 (4th Cir. 1979) (double jeopardy applies where a court hears evidence

## X.    IF CONTEMPT PROCEEDINGS WERE ALLOWED TO CONTINUE AGAINST MR. BOLDEN, THEY MUST BE BEFORE ANOTHER JUDGE

### A.    Because The Court Has Made Factual Findings And Legal Conclusions That Mr. Bolden Committed The Violations For Which Mr. Bolden Faces Punishment For Contempt, And Because Those Findings And Conclusions Must Be Set Aside Because They Were Not Made In Proceedings That Comported With Rule 42(a) Or Mr. Bolden's Constitutional Rights, Any Further Proceedings Against Mr. Bolden Must Be Before A Different District Judge

Principles governing the judicial process require the need for a different District Judge to preside over any future proceedings that might be held in this matter. The findings and conclusions by the Court that were made by the Court without complying with Rule 42(a) or Mr. Bolden's constitutional rights must be set aside. In any further proceeding, the factual and legal issues would have to be considered anew. Under these circumstances, any further proceeding in this matter must be before a different District Judge.

In *United States v. Neal,* 101 F.3d 993, discussed above, the Fourth Circuit held that, on remand, any further proceedings should be held before a different District Judge. That step was required in *Neal,* and it is likewise required here, because the first District Judge made findings that the contemnor committed violations in a proceeding that did not comport with the procedural requirements of Rule 42(a). *See Neal,* at 1000, n. 5 ("Here, while we do not question the personal integrity of the district judge, because guilt was adjudicated in the earlier proceeding, the appearance of fairness and impartiality is best advanced by reassignment to another district judge.").

---

and improperly enters a mistrial). The Court need not reach this issue at this time, but if the matter were to proceed, Mr. Bolden reserves the right to more formally raise the issue.

**B.**    **Any Further Proceedings Should Proceed Before A Different District Judge Because The Court Has Taken Personal Affront At Mr. Bolden's September 14, 2022 Expletive**

In his emotional outburst outside the courthouse on September 14, 2022, Mr. Bolden reacted to the personal attacks that the prosecutors had made upon him while they argued for, and obtained, a trial postponement, by describing them as "bull---- ."  Mr. Bolden used language that he immediately and thoroughly regretted.  As discussed above, Mr. Bolden apologized to the Court for his use of such language at the earliest possible moment, and the Court accepted his apology.

Notwithstanding this backdrop and the Court's acceptance of Mr. Bolden's apology, the Court clearly took Mr. Bolden's regrettable comment as a personal afront and apparently discussed the incident with others about their reactions, stating during the January 17 hearing as follows:

> The Court wants to also take **a personal moment** to say how **hurtful it was to hear profanity used on the courthouse steps. Hurtful** to the employees of this institution, to the judges and to the staff.  Many have worked tirelessly in connection with this proceeding in particular to make it accessible and productive for counsel, for the Defendant and for the public.  And **to hear the use of profanity** just moments after we concluded the proceeding **was particularly hurtful** to this community and **very troubling** to the Court.

Mr. Bolden and counsel recognize that the Court's sentiments, and the personal hurt that the Court expressed, are genuine and heartfelt.  No one regrets that the Court remains personally affronted, despite Mr. Bolden's repeated apologies, more than Mr. Bolden himself.  However, the fact that the Court takes this event so personally triggers authority that requires the Court to step aside and for any further proceedings, were they to take place, to be before a different District Judge.

Rule 42(a)(3), provides that, "If the criminal contempt involves disrespect toward or criticism of a judge, that judge is disqualified from presiding at the contempt trial or hearing unless the defendant consents."  While Mr. Bolden intended no disrespect toward the Court, the Court

took Mr. Bolden's outburst outside the courthouse, even though directed at the prosecutors' personal attacks, as disrespect for her and others. The Court was also so personally offended that, even four months after Mr. Bolden apologized and the Court accepted the apology, the Court found it necessary to make the "personal" statement about how "hurtful" Mr. Bolden's comment continues to be. In view of the Court's ongoing "personal" feelings about Mr. Bolden's "hurtful" conduct, it is clear that the Court continues to regard Mr. Bolden's conduct as disrespectful toward her and that any further proceedings in this case, if they were to take place, should be before a different District Judge. *Cf. Offutt v. United States,* 348 U.S. 11, 17 (1954).

## XI. <u>CONCLUSION</u>

Courts frequently exercise their discretion to terminate criminal contempt proceedings when there are doubts about the legal or factual basis for continuing or out of regard for the admonitions of the Supreme Court and federal appellate courts that the criminal contempt power should be exercised sparingly. Both of those considerations are present here. There are particular reasons for not going forward in this case because Mr. Bolden did not deliberately file publicly a document that the Court believes he should have realized was required to be under seal and because his comments outside the courthouse on September 14th were the manifestation of an extreme emotional reaction to the events that had just recently occurred.

Those who know Mr. Bolden well know also that Mr. Bolden reveres the law and its institutions and that he would never willfully or intentionally engage in conduct disrespectful to this Court or any other courts. Some have submitted Declarations in which they attest to Mr. Bolden's unblemished character and to his lifetime of community service and civic and professional leadership. They know that Mr. Bolden is deeply and genuinely remorseful over the emotional outburst that, in large measure, brings Mr. Bolden before the Court in this proceeding

and that Mr. Bolden suffers now, and will continue to suffer, from the criticism by his uncharacteristic loss of composure has engendered.

The Declarations from some who know Mr. Bolden well, and who know of his genuine contrition, all attest to his high character and his sincere regrets about the actions that have led to these proceedings:

- "Scott is a renowned white-collar criminal defense lawyer, litigator, and former managing partner of the Washington, D.C. office of Reed Smith, LLP, an international law firm. His reputation for integrity, professionalism, and ethical conduct are well-known. I know of Scott's reputation from my interactions with him and through my conversations with fellow state and federal judges. Scott is an outstanding lawyer with a high degree of respect for the court and its directives. I do not believe that Scott would ever knowingly disregard any order from a court."
  **Hon. Gerald Bruce Lee**, *United States District Court for the Northern District of Virginia (retired), Exhibit 24, Para. 5*

- "I was shocked when I heard of the events leading to Scott being called before this Court, as they were so out of character for the Scott I have known through the years. Scott has consistently displayed the highest respect for our courts and the Bench, comporting himself accordingly. I have not known him to have ever done anything previously which would call his professionalism or character into question. I believe that Scott has sincere remorse for his conduct."
  **Hon. Kurt L. Schmoke**, *President, University of Baltimore and former Mayor of Baltimore, Exhibit 25, Para. 8-9*

- "From my personal history with Scott, I am unaware of any instance in which he has knowingly violated any directive or command from any court. Nor have I known him to flaunt the Rules of any Court. In my experience, I have known Scott to exhibit only the utmost professional conduct expected from an attorney. Though I do not believe it justifies inappropriate conduct, it is my considered judgment that any deviation from that uprightness and any use of any inappropriate language would only arise in a momentary, unwitting lapse in the midst of a hotly contested matter."
  **Benjamin F. Wilson, Esq.** *Former Chair, Beveridge & Diamond PC (retired), Exhibit 26, Para. 10*

- "Scott has had an amazing career. He is an inspiration to untold numbers of young African-American attorneys and revered within the legal profession. Scott is passionate, aggressive, and highly ethical. He is a zealous and indefatigable advocate for the cause of justice, emblematic of all the ideals which the profession celebrates among its greatest members. Scott is an attorney who has had an exceptional record as an attorney, advocate, and counsel."
  **Artis Hampshire-Cowan, Esq.,** *founder and principal of Leveraged Leadership Group, LLC and Senior Fellow, the Association of Governing Boards of Universities and Colleges, Exhibit 27, Para. 13*

- "That Scott would knowingly or intentionally engage in contemptuous behavior is anathema to everything that I have known – and continue to know – about Scott. While not an excuse for offensive or inappropriate conduct, from what I know, Scott's actions appear to have been committed in the heat of litigation and are significantly out of character for the man of high regard I have known so well. I know that Scott is humbled and deeply remorseful for his conduct."
  **Ronald Sullivan, Jr., Esq.** *Jesse Climenko Clinical Professor of Law, Harvard Law School and Faculty Director of the Harvard Criminal Justice Institute and the Harvard Trial Advocacy Workshop, Exhibit 28, Para. 13*

Mr. Bolden respectfully submits that, for the reasons stated herein, this Court should deem its Show Cause Order satisfied and dismiss this criminal contempt case.

Dated: February 10, 2023

_____/s/_____
Arnold M. Weiner, Bar No. 01605
aweiner@rwllaw.com
Stuart A. Cherry, Bar No. 28012
scherry@rwllaw.com
Geoffrey W. Washington, Bar No. 25098
gwashington@rwllaw.com
Devon L. Harman, Bar No. 21936
dharman@rwllaw.com
RIFKIN WEINER LIVINGSTON LLC
2002 Clipper Park Road, Suite 108
Baltimore, MD 21211
Phone: (410) 769-8080
Fax:    (410) 769-8811

*Attorneys for A. Scott Bolden.*